**Milbank LLP**
Daniel M. Perry (State Bar #264146)
DPerry@milbank.com
Mark D. Villaverde (State Bar #331876)
MVillaverde@milbank.com
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile: (213) 629-5063

*Attorneys for Defendants PLDT Inc.,*
*Manuel V. Pangilinan, Alfredo S. Panlilio,*
*and Marilyn A. Victorio-Aquino*

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

DR. KEVIN DOUGLAS,
Individually and on behalf of all
others similarly situated,

                Plaintiff,

    vs.

PLDT INC., *et al.*,

                Defendants.

Case No. 2:23-CV-00885-CJC-MAA

Honorable Cormac J. Carney
PRESIDING JUDGE

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES**

Date:       January 29, 2024
Time:      1:30 p.m.
Location:  411 West Fourth St.
Courtroom: 9B

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ....................................................................1

II.   FACTUAL BACKGROUND ......................................................................5

    A.    PLDT's Telecommunications Business and CapEx Process...............5

    B.    PLDT's Network Expansion and Associated Increases in
        CapEx .................................................................................................7

    C.    PLDT's December 2022 Market Update on Capital Investments .......8

    D.    PLDT's December 2022 Special Call .................................................9

    E.    PLDT's March 2023 Announcement of the Completion of Its
        Internal Investigation and the Absence of Any Basis to Restate
        Any of Its Prior Financial Statements...............................................10

    F.    This Action ......................................................................................11

III.  APPLICABLE LEGAL STANDARDS .....................................................11

IV.   ARGUMENT............................................................................................12

    A.    Plaintiff Fails to Allege Any Material Misrepresentation or
        Omission...........................................................................................13

        1.    CapEx Statements .................................................................13

            a.    Plaintiff fails to adequately allege that PLDT
                understated its prior CapEx spending. .........................13

            b.    Plaintiff's bases for asserting that PLDT's CapEx-
                related statements were false or misleading are
                improper and inadequate to support a claim for
                relief. ...........................................................................16

            c.    Forward-looking CapEx statements Plaintiff
                challenges are protected by the PSLRA's safe
                harbor provision.......................................................20

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

d.   As to opinion CapEx statements, Plaintiff fails to allege that the maker did not believe them to be true when made..........................................................22

2.   5G Rollout Statements ............................................................23

3.   Internal Controls Statements ..................................................26

a.   Plaintiff fails to adequately allege that the internal controls statements were false or misleading................26

b.   Plaintiff fails to allege any Defendant made representations about internal controls with actual knowledge they were false. ..........................................29

4.   Depreciation and Net Income Statements..............................31

B.   Plaintiff Fails to Plead Scienter ..........................................................32

1.   Plaintiff's Allegations, Standing Alone, Do Not Create a Strong Inference of Scienter...................................................34

a.   Defendants' Alleged Desire to "Address Competitive Pressures."................................................34

b.   PLDT's Alleged "Admission" That It Failed to Track/Monitor CapEx Spending. ...............................35

c.   Individual Defendants' Access to CapEx Information. .................................................................36

d.   Alleged "Admission" That PLDT Lacked Internal Controls. ...................................................................38

e.   Certain Individual Defendants' "Detailed" Responses to Analyst Questions..................................39

f.   Membership on PLDT's Technology Strategy Committee. ...............................................................39

g.   Management Reorganization and Subsequent Internal Investigation and Regulatory Scrutiny. ..........40

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

h.     PLDT's Alleged "Pattern of Recklessly Overspending" on CapEx............................................41

i.     Plaintiff's Core Operations Theory. ...........................42

2.     Plaintiff's Allegations, Viewed Holistically, Create No Inference of Scienter ...............................................43

C.     Plaintiff Fails to Plead Loss Causation..............................................44

D.     Plaintiff's Claims Against the Individual Defendants Are Improperly Group Pled and Deficient for the Foregoing Reasons................................................................46

E.     Plaintiff's 20(A) Claims Fail as a Matter of Law ...........................49

V.     CONCLUSION ..........................................................................49

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                           **Page(s)**

*Alan Neuman Prods., Inc. v. Albright*,
   862 F.2d 1388 (9th Cir. 1988)................................................................21

*In re Am. Apparel, Inc. S'holder Litig.*,
   2013 WL 174119 (C.D. Cal. Jan. 16, 2013) .....................................................37

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
   2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019)..............................................30, 32

*Anderson v. Peregrine Pharms., Inc.*,
   2013 WL 12122423 (C.D. Cal. Aug. 23, 2013)..................................................43

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................11

*Brodsky v. Yahoo! Inc.*,
   592 F. Supp. 2d 1192 (N.D. Cal. 2008)................................................................23

*Burritt v. NutraCea*,
   2010 WL 668806 (D. Ariz. Feb. 25, 2010)................................................................41

*Buttonwood Tree Value Partners LP v. Sweeney*,
   910 F. Supp. 2d 1199 (C.D. Cal. 2012) ................................................................36

*Cheung v. Keyuan Petrochemicals, Inc.*,
   2012 WL 5834894 (C.D. Cal. Nov. 1, 2012)................................................................46

*In re Downey Sec. Litig*,
   2009 WL 2767670 (C.D. Cal. Aug. 21, 2009)................................................................41

*In re Downey Sec. Litig.*,
   2009 WL 736802 (C.D. Cal. Mar. 18, 2009)................................................................40

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)................................................................45

*In re GAP Sec. Litig.*,
   1991 WL 17091 (9th Cir. Feb. 8, 1991) ................................................................17

*Glen Holly Ent., Inc. v. Tektronix, Inc.*,
   352 F.3d 367 (9th Cir. 2003)................................................................22

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

*In re GlenFed, Inc. Sec. Litig.*,
42 F.3d 1541 (9th Cir. 1994) ......................................................... 16, 19, 21, 26

*In re Hansen Nat'l Corp. Sec. Litig.*,
527 F. Supp. 2d 1142 (C.D. Cal. 2007) ............................................................ 41

*Harris v. AmTrust Fin. Servs.*,
135 F. Supp. 3d 155 (S.D.N.Y. 2015) ....................................................... 15, 32

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
554 F. Supp. 2d 1083 (C.D. Cal. 2008) ............................................................ 36

*Jiangchen v. Rentech, Inc.*,
2018 WL 11513254 (C.D. Cal. Nov. 1, 2018) .................................................. 34

*Kaplan v. Charlier*,
426 F. App'x 547 (9th Cir. 2011) ..................................................................... 39

*Karpov v. Insight Enters., Inc.*,
2010 WL 2105448 (D. Ariz. Apr. 30, 2010) .................................................... 39

*Knievel v. ESPN*,
393 F.3d 1068 (9th Cir. 2005) ............................................................................ 5

*Knox v. Yingli Green Energy Holding Co.*,
2017 WL 3503358 (C.D. Cal. Aug. 15, 2017) .................................................. 43

*Korzen v. Tetra Tech Inc.*,
2014 WL 12603209 (C.D. Cal. Jan. 17, 2014) ................................................. 42

*Lechner v. Infusystem Holdings, Inc.*,
2017 WL 11593803 (C.D. Cal. Dec. 15, 2017) ................................................ 45

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002) ..................................................................... 36, 37

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ..................................................... 22, 25, 31, 44

*In re Lockheed Martin Corp. Sec. Litig.*,
272 F. Supp. 2d 944 (C.D. Cal. 2003) .............................................................. 40

*May v. KushCo Holdings, Inc.*,
2020 WL 6587533 (C.D. Cal. Sept. 25, 2020) ................................................. 35

v

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

*McCasland v. FormFactor Inc.*,
2008 WL 2951275 (N.D. Cal. July 25, 2008) ...................................................... 17

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) ................................................................... *passim*

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) .................................................................... *passim*

*N. Eng. Carpenters Guaranteed Annuity & Pension Funds v.
DeCarlo*, 2023 WL 5419147 (2d Cir. Aug. 23, 2023) ...................................... 30

*Nathanson v. Polycom, Inc.*,
87 F. Supp. 3d 966 (N.D. Cal. 2015) ................................................................ 27

*In re Nektar Therapeutics Sec. Litig.*,
34 F.4th 828 (9th Cir. 2022) ............................................................................ 44

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) .......................................................................... 49

*Okla. Firefighters Pension & Ret. Sys. v. IXIA*,
50 F. Supp. 3d 1328 (C.D. Cal. 2014) ............................................................. 38

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension
Fund*, 575 U.S. 175 (2015) ......................................................................... 29, 30

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) ..................................................................... 12, 46

*Patel v. Parnes*,
253 F.R.D. 531 (C.D. Cal. 2008) ......................................................... 12, 17, 27

*Pittleman v. Impac Mortg. Holdings, Inc.*,
2009 WL 648983 (C.D. Cal. Mar. 9, 2009) ...................................................... 43

*Plumley v. Sempra Energy*,
2018 WL 1470224 (S.D. Cal. Mar. 26, 2018) ............................................. 42, 43

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ............................................................. 37, 42, 43

*Prodanova v. H.C. Wainwright & Co., LLC*,
993 F.3d 1097 (9th Cir. 2021) ..................................................................... 35, 36

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017).................................................................20

*In re Redback Networks, Inc. Sec. Litig.*,
  2007 WL 963958 (N.D. Cal. Mar. 30, 2007)......................................................16

*Reed v. Amira Nature Foods*,
  2016 WL 6571281 (C.D. Cal. July 18, 2016)...............................................15, 32

*In re Rigel Pharms., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012)..................................................................34

*Rok v. Identiv, Inc.*,
  2017 WL 35496 (N.D. Cal. Jan. 4, 2017)........................................................28

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001)...............................................................23, 24

*Roofer's Pension Fund v. Papa*,
  2023 WL 5287783 (D.N.J. Aug. 17, 2023) ...................................... 14, 21, 25, 32

*ScripsAmerica, Inc. v. Ironridge Glob. LLC*,
  119 F. Supp. 3d 1213 (C.D. Cal. 2015).....................................................41, 42

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
  485 F. Supp. 3d 1113 (N.D. Cal. 2020).......................................................*passim*

*In re Silicon Graphics, Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999).................................................................33, 34

*In re Silicon Storage Tech., Inc. S'holder Deriv. Litig.*,
  2009 WL 1974535 (N.D. Cal. July 7, 2009)......................................................40

*Strasburger v. Blackburne & Sons Realty Cap. Corp.*,
  2020 WL 6128069 (C.D. Cal. Apr. 22, 2020) ...........................................35, 36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)........................................................................5, 12, 33

*In re U.S. Aggregates, Inc. Sec. Litig.*,
  235 F. Supp. 2d 1063 (N.D. Cal. 2002)........................................................40

*In re VeriFone Sec. Litig.*,
  784 F. Supp. 1471 (N.D. Cal. 1992)...........................................................22

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

*Webb v. Solarcity Corp.*,
884 F.3d 844 (9th Cir. 2018)........................................................................35, 43

*In re Wet Seal, Inc. Sec. Litig.*,
518 F.Supp.2d 1148 (C.D. Cal. 2007) ...............................................................45

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021).............................................................................45

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009)........................................................................*passim*

**Statutes**

15 U.S.C. § 78t(a) ...................................................................................12, 49

15 U.S.C. § 78u–4..............................................................................................12

15 U.S.C. § 78u–4(b)(1)(B) ..............................................................................12

15 U.S.C. § 78u–4 (b)(2)(A) .............................................................................12

15 U.S.C. § 78u-4(b)(2) .....................................................................................33

Securities and Exchange Act.......................................................................*passim*

Private Securities Litigation Reform Act ..................................... 12, 17, 20, 27, 34

Sarbanes-Oxley Act Section 404.......................................................................26

**Other Authorities**

Fed. R. Civ. P. Rule 9(b)....................................................................................12

Fed. R. Civ. P Rule 12(b)(6) ..........................................................................5, 11

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

**MEMORANDUM OF POINTS AND AUTHORITIES**

Defendants PLDT Inc. ("PLDT" or the "Company") Manuel V. Pangilinan, Alfredo S. Panlilio, and Marilyn A. Victorio-Aquino (the "Individual Defendants," together with PLDT, "Defendants"), by and through their attorneys, respectfully submit this memorandum of law in support of their motion to dismiss the Amended Complaint for Violations of the Federal Securities Laws (ECF No. 33) ("AC" or the "Complaint") filed by lead plaintiff Dr. Kevin Douglas ("Plaintiff").

## I.    PRELIMINARY STATEMENT

PLDT is a leading telecommunications and digital service provider in the Philippines, where it offers services to tens of millions of users. Its common shares trade on the Philippine Stock Exchange ("PSE"), and its American Depositary Shares ("ADS")—each of which represents one PLDT common share—have traded on the New York Stock Exchange since 1994.

In 2019, PLDT announced that it (together with one of its subsidiaries) was embarking on a long-term network transformation program to upgrade its fixed and wireless networks infrastructure. The transformation, which remains underway, is intended to meet customer demand and maintain PLDT's competitive posture in response to efforts by the Philippine government to increase competition among telecommunications services providers. The transformation includes efforts to offer customers next-generation cellular advances, such as fifth generation wireless (or "5G") technology.

The network transformation program involves multiyear projects and increased investment in PLDT's property and equipment—PLDT's "capital"—including cell towers, fiber cables, and network hardware. Between fiscal years 2019 and 2022, PLDT's consolidated capital expenditures ("CapEx") across all of its operations totaled 331 billion Philippine pesos (during which time 1 Philippine peso, or "PHP," generally equaled approximately .02 U.S. dollars).

On December 16, 2022, PLDT issued a press release regarding the network transformation program. It explained that the program had reached many of its goals but that it "came at a price" as PLDT's "CapEx investments" over the 2019 to 2022 period totaled ₱379 billion, including an "estimated budget overrun of no more than PHP 48 billion." It noted that CapEx for 2023 would "continue to be elevated as the capex overruns enter the financial statements." The release added that the amount of the "budget overrun" was a "best estimate" subject to ongoing internal review and discussions with vendors to reduce the overrun, and that PLDT had not uncovered any fraudulent transactions, procurement anomalies, or loss of assets. It made no mention of any pending or contemplated restatement of PLDT's prior financial results.

The press release was submitted to the PSE, U.S. Securities & Exchange Commission ("SEC"), and Philippine Dealing & Exchange Corporation on Friday, December 16, 2022, and was filed with the SEC on Monday, December 19, 2022 (the "Press Release"). By the close of the trading day on December 19, PLDT's ADS share price fell approximately 23% to $20.46 from its closing price of $26.81 on December 16.

On February 6, 2023, Sophia Olsson filed suit in this District against PLDT and certain of its current or former officers and directors alleging defendants engaged in a scheme to defraud investors in violation of the Securities Exchange Act ("Exchange Act"). Following the Court's appointment of Kevin Douglas as lead plaintiff, Plaintiff filed the Complaint on July 7, 2023. The Complaint—over two-hundred pages long—largely consists of a listing of over 100 alleged misstatements separated into four categories, each followed by a repetitive recitation of generic allegations as to why the statements were purportedly false and misleading when made.

In sum, Plaintiff alleges that PLDT's Press Release, and statements PLDT management made during a conference call with investors a few days thereafter, on

December 21, 2022 (the "Special Call")—which the Complaint selectively and misleadingly quotes—revealed as false and misleading Defendants' past statements made between April 23, 2020 and December 19, 2022 (the putative "Class Period") regarding (i) the amount of CapEx PLDT spent over prior reporting periods, (ii) the pace of PLDT's rollout of 5G services and public adoption of 5G, (iii) the effectiveness of PLDT's internal controls, and (iv) the amount of PLDT's depreciation expenses and net income. Plaintiff does not allege that any defendant was improperly enriched by sales of PLDT securities during the Class Period. Instead, he alleges that the purported fraud was motivated by PLDT's desire to address market pressures.

The materials incorporated by reference into the Complaint make clear that Plaintiff's claims are based on his implausible mischaracterization of the Press Release. The Press Release made clear that the anticipated budget "overrun" concerned CapEx that would affect PLDT's financial results in *future* reporting periods. It was not, as Plaintiff alleges, corrective of PLDT's past statements regarding CapEx over prior reporting periods or (as to which it says nothing at all) PLDT's depreciation expenses and net income. During the Special Call, PLDT representatives expanded upon the nature of PLDT's elevated CapEx. They made clear that the Company's CapEx "investments" from 2019 to 2022—which included received and recorded capital (*i.e.*, amounts that were already reported as CapEx in financial disclosures) and purchase orders for future capital investments that would not be fulfilled until after 2022 (the items subject to the "budget overrun")—had become misaligned with the goals of the network transformation program, given, for example, that customer acceptance of 5G technology was slower than expected. Nowhere in the Press Release or during the Special Call did the Company suggest its prior disclosures were inaccurate. Indeed, PLDT's March 23, 2023 press release (the "March 23 Press Release") announced that it completed its internal forensic review of its elevated CapEx spend, that it "identified no evidence of fraud,

intentional concealment, or bad faith conduct on the part of any employee," and that there was "no basis to restate the Company's historical financial statements."

While PLDT has been clear at all times (including in the March 23 Press Release) that it is adopting and implementing operational enhancements to its policies, procedures and controls relating to its CapEx management processes, there is no "admission" of "inadequate" controls regarding reporting of financial results (as Plaintiff alleges) in the Press Release or any other statements by PLDT.

This lawsuit is nothing more than a strike suit filed in response to a stock price drop, and should be dismissed:

*First*, Plaintiff fails to plead facts demonstrating that PLDT made any material misstatement or omission. The statements Plaintiff challenges are all either factual reporting of PLDT's financials that have not been restated, unactionable forward-looking statements, statements that are too generalized, vague and unspecific to be actionable, or unactionable statements of opinion. None of the statements in either the Press Release or the Special Call correct or contravene past statements.

*Second*, Plaintiff fails to plead facts showing that anyone at PLDT acted with an intent to defraud. Plaintiff offers no less than nine theories of scienter. The essence of Plaintiff's allegations is that the Individual Defendants, by virtue of their access to information and as evidenced by statements made after the class period, knew or should have known that the statements Plaintiff challenges were false when made. Though numerous, no theory of scienter Plaintiff offers stands.

*Third*, Plaintiff fails to plead facts demonstrating loss causation because he has not traced his alleged $240.23 loss to the purported fraud. Plaintiff appears to allege that the Press Release disclosed the "truth" to the market, leading to a drop in stock price. Although PLDT's stock price did fall after the Press Release, Plaintiff has not pleaded facts demonstrating that the drop was caused by the purported revelation of prior misstatements instead of PLDT's disclosure of new "firm-specific facts" about its *future* financial condition—*i.e.*, the impact of the CapEx budget

4

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

overrun on PLDT's financial results in the future. The Complaint does not allege how any of the other categories of statements Plaintiff challenges were shown to be false or misleading by any alleged corrective disclosure.

*Fourth*, Plaintiff's Section 10(b) claims against the Individual Defendants fail as improperly group pled and inadequately alleged for the above reasons. And his Section 20(a) claim against the Individual Defendants fails because the Complaint fails to plead any underlying violation of the Exchange Act.

Because the Complaint would not be improved by amendment, the Court should dismiss it with prejudice.

## II.    FACTUAL BACKGROUND[1]

### A.    PLDT's Telecommunications Business and CapEx Process

PLDT is a leading telecommunications and digital service provider in the Philippines. AC ¶ 36. Through three principal business segments—"Wireless," "Fixed Line," and "Others"—it offers services to nearly 80 million users in the Philippines (as of December 2022). *Id.* ¶¶ 38-41. The telecommunications sector is capital-intensive and subject to ever-evolving technological advancements. *Id.* ¶ 60. To remain competitive as new technologies develop, telecommunications companies like PLDT must invest in replacing, rebuilding, or upgrading their networks. *Id.* ¶ 58.

---

[1] This background draws on Plaintiff's allegations as well as documents incorporated by reference into the complaint. On Rule 12(b)(6) motions, "courts must consider the complaint in its entirety," as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (courts may " take into account documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading'"). Courts may take judicial notice of "matters of public record," such as SEC filings. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (acknowledging propriety of taking judicial notice of SEC filings). All "Ex." references herein are to exhibits to the Declaration of Daniel M. Perry, dated October 10, 2023, filed herewith; accompanying pincites refer to the page numbers affixed to the footer of each exhibit.

The property and equipment required for those efforts are known as capital and the associated costs are known as capital expenditures or "CapEx." *Id.* ¶ 59.

Each year beginning around August, PLDT sets an annual anticipated CapEx budget for the following year. *Id.* ¶¶ 64-65. The budget is developed through a collaborative effort involving various department heads including the Head of Network, the individual who oversees the Company's telecommunications network. *Id.* It is later reviewed by at least the CFO before it is ultimately endorsed for Board approval. *Id.*

Business units, which lead PLDT's capital projects, must obtain approval to place orders for CapEx through a multi-level review process involving the Head of Network, Procurement Department, Technology Strategy Committee, and Finance Department. *Id.* ¶¶ 65-68. Generally, once requests for CapEx are approved and the Procurement Department selects a vendor, purchase orders to acquire the necessary capital are issued to vendors. *Id.* ¶ 68. PLDT records purchase order data on the SAP (Systems Applications and Products) software platform. *Id.* ¶ 69.

PLDT records capital as CapEx on its balance sheet, and counts it against the annual budget, after the property or equipment is received and accepted by the Company. *See* AC ¶ 59; *see also, e.g.*, Ex. A at 27 (2021 Form 20-F stating that capital expenditures reflect "gross additions to property and equipment"); Ex. B at 384 (Special Call: "And once the project is completed, hardware installed and services fulfilled, it is accepted by PLDT and recorded as a part of [property, plants, and equipment]."). When PLDT pays vendors for purchase orders before receiving the capital, those payments are accounted for as advances, not CapEx. *See, e.g.*, Ex. A at 269 (2021 Form 20-F line entry for "Advances to suppliers and contractors"); *see also* Ex. B at 384 (Special Call: "[T]here's a line in the balance sheet that says advances to vendors[.]"); *id.* ("[P]ayments to the vendors are reflected in the advances.").

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

**B.    PLDT's Network Expansion and Associated Increases in CapEx**

In 2019, PLDT, together with one of its subsidiaries, embarked on a network expansion transformation program. AC ¶ 89; *see also* Ex. C at 424-25 (2019 Form 20-F). Plaintiff alleges the overhaul of the Company's network was in response to increasing pressure from the Philippine government, new market competitors, and consumer demand for LTE and 5G services. AC ¶ 89. PLDT's public filings disclosed that this network expansion would require an increase in CapEx.[2] In its Form 20-F filed each year, PLDT issued guidance regarding the amount of CapEx it expected to incur the following year—none of which Plaintiff challenges. *Id.* (citing estimates reported in PLDT's 2018 Form 20-F at 744, 2019 Form 20-F at 414, 2020 Form 20-F at 1074, 2021 Form 20-F at 27).

One of PLDT's substantial, multi-year components of its network expansion was the rollout of 5G technology. *Id.* 5G is the latest iteration of cellular technology engineered to increase the speed and responsiveness of wireless networks. *Id.* As part of the network expansion, PLDT engaged numerous vendors to build hundreds of cell towers to host the 5G network. *Id.* ¶ 99. PLDT cautioned investors that its digital transformation, including its 5G rollout, may not proceed at the expected pace, including because the potential for demand might not materialize. *See, e.g.*, Ex. E at 1065 (2020 Form 20-F: "We may not be able to accurately predict further technological trends or the success of new services in the market."); Ex. C at 406 (2019 Form 20-F: "In particular, as part of our extensive capital expenditures program to overhaul our fixed and wireless networks infrastructure and our IT

---

[2] *See, e.g.*, Ex. D at 744 (2018 Form 20-F: "Our projects under development and the continued maintenance and improvement of our networks and services . . . require substantial ongoing capital investment."); *id.* at 776 ("We expect that in 2019, cash from operating activities should enable us to increase the level of our capital expenditures for the continued expansion and upgrading of our network infrastructure."); Ex. C at 414 (2019 Form 20-F: same); *id.* at 445 (same); Ex. E at 1073, 1109 (2020 Form 20-F: same); Ex. A at 27, 62 (2021 Form 20-F: same).

systems, we have entered into agreements with [various entities] to upgrade and modernize a significant portion of our IT infrastructure. We cannot guarantee that we will be able to accomplish this transformation in a timely fashion, or at all, or in the manner intended.").[3]

### C. PLDT's December 2022 Market Update on Capital Investments

In a press release filed with the PSE on December 16, 2022 and the SEC on December 19, 2022, PLDT updated the market regarding the network transformation program it had been engaged in over the past four years. Ex. F. The release described several of the program's "large multi-year CapEx projects," announced that the Company had reached its goals of "regain[ing] and sustain[ing] market and technology leadership as well as provid[ing] the best customer experience," and described advances it had made in its network capabilities, standing among competitors, and revenues. *Id.* at 1431.

The release also disclosed that meeting its goals "came at a price," as "CapEx investments for these past four years aggregated PHP 379 million," including "an estimated budget overrun of no more than PHP 48 billion." *Id*. It explained that "CapEx for 2023 will continue to be elevated as the capex overruns enter the financial statements this year and next . . . ." *Id.* at 1432. It added, however, that the amount of the "budget overrun" was a "best estimate," subject to internal forensic review and "discussions with principal vendors," that vendors had shown

---

[3] *See also* Ex. E at 1065 (2020 Form 20-F: "We are dependent on the availability of 5G network equipment and software, as well as 5G-capable devices such as handsets and modems before we can roll out commercial services and generate revenues. A delay in the release of reasonably-priced 5G handsets could negatively impact the mass acceptance of 5G services among our customers and our ability to monetize these investments"); *id*. at 1067 ("Any economic, technological or other developments resulting in a reduction in demand for mobile services or otherwise causing the Philippine mobile telecommunications industry to stop growing or slow down its growth, could materially harm our business, results of operations, financial condition and prospects.").

willingness to meet PLDT's "requests involving reduction of outstanding work," and that the Company's investigation into the matter had thus far "not uncovered any fraudulent transactions, procurement anomalies, or loss of assets." *Id.* at 1431-32. The release noted that PLDT had "initiated improvements on its processes and systems to address weaknesses that allowed such budget overruns to occur." *Id.* at 1432. It made no mention of any pending or contemplated restatement of PLDT's prior financial results. On December 19, 2022, PLDT's stock price dropped approximately 23%. AC ¶ 315.

### D.    PLDT's December 2022 Special Call

On December 21, 2022, two days after the end of the Class Period, PLDT held a "Special Call" for investors and analysts to address the CapEx spend. AC ¶ 12. During the Special Call, parts of which Plaintiff (often selectively and misleadingly) quotes in the Complaint, PLDT discussed topics disclosed in the Press Release and answered analysts' questions. PLDT shared information regarding the CapEx "budget overrun"—much of which undercuts Plaintiff's allegations and which, unsurprisingly, Plaintiff omits from his Complaint (but which this Court can and should consider in resolving the instant motion).

*First*, PLDT explained on the Special Call that it did not expect to restate its past financial statements and that an internal review found "no fraud," "no anomalies," "no evidence of over pricing," and "no unauthorized CapEx projects." Ex. B at 373; *id.* at 383 ("[T]here are no unrecorded transactions or unauthorized transactions in the system."). PLDT explained that "the CapEx subject to the overruns will be used in the business in the next 3 or so years"—*i.e.*, that the ₱48 billion "overrun" reported to the market represented future capital expenses. *Id.* at 373.

*Second*, PLDT explained that the ₱48 billion CapEx overrun would not be recognized in its previous years' cash flow because the figure represented incoming "works *to be* completed and goods *to be* delivered" that would be recognized in later

9

years. *Id*. at 387-88 (emphases added). PLDT further explained that the amount of CapEx reported (the figures Plaintiff now complains were false) represented the amount of CapEx delivered, as opposed to future planned expenditures. *Id*. at 383 ("[W]hen we report to you, we tell you what the CapEx for the year was actually spent[.]").

*Third*, PLDT refuted on the Special Call any speculation that it was lacking internal controls. *Id*. at 378 ("But to when people allege that there are no control processes in place, that's not right[.] It is simply not right.").

### E.   PLDT's March 2023 Announcement of the Completion of Its Internal Investigation and the Absence of Any Basis to Restate Any of Its Prior Financial Statements

On March 23, 2023, PLDT filed with the PSE and the SEC a press release updating investors on its internal review and ongoing efforts to reduce CapEx (both initially disclosed in the Press Release). The March 23 Press Release stated that the CapEx "budget overrun" "represented management's estimate of the outstanding commitments to its major vendors for the acquisition of property and equipment *post-2022* after the anticipated cancellation or amendment of certain outstanding purchase orders." Ex. G at 1455 (emphasis added). It also reported that PLDT successfully reduced outstanding commitments to major vendors post-2022 to approximately ₱33 billion net of advances paid to these vendors, and that PLDT also planned to engage in similar discussions with non-major vendors. *Id.*

The release also stated that the internal "review, which was conducted by external counsel with the assistance of accounting and audit consultants, focused on the period 2019-2022 and identified no evidence of fraud, intentional concealment, or bad faith conduct on the part of any employee of the Company and no basis to restate the Company's historical financial statements." *Id.* It also reported that the Company had "adopted and implemented, or [was] in the process of implementing,

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

various operational enhancements to its policies, procedures and controls related to its CapEx management processes." *Id.*

### F.    This Action

On February 6, 2023, Sophia Olsson initiated this Action by filing a putative class action complaint alleging that Defendants violated the antifraud provisions of the federal securities laws. ECF No. 1. On July 7, after being appointed by the Court as lead plaintiff, ECF No. 24, Plaintiff filed the Complaint *sub judice*. ECF No. 33. In it, Plaintiff alleges that all Defendants violated Section 10(b) of the Exchange Act (and SEC Rule 10b–5 promulgated thereunder) and the Individual Defendants (current or former officers and directors of PLDT) violated Section 20(a) of the Exchange Act. AC ¶¶ 1, 424-37. Plaintiff's claims are premised on his allegations that Defendants committed securities fraud by making false and misleading statements and omissions during the Class Period with respect to four categories of statement: (i) CapEx (78 statements); (ii) the 5G rollout (10 statements); (iii) internal controls (12 statements); and (iv) depreciation and net income (12 statements). *Id.* ¶¶ 127-311, 424-28. Plaintiff does not allege that any of the Individual Defendants engaged in insider trading.

## III.   APPLICABLE LEGAL STANDARDS

A complaint must be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).[4] Although the Court must accept alleged facts as true, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* at 678. Nor does a complaint suffice "if it tenders naked assertions devoid of further factual enhancement." *Id.*

---

[4] Unless otherwise indicated, all internal quotation marks and citations are omitted herein.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

In addition to the allegations within the four corners of the complaint, the court may also consider "documents incorporated into the complaint by reference" and "matters of which a court may take judicial notice." *Tellabs,* 551 U.S. at 322; *see also Metzler*, 540 F.3d at 1064 n.7. The Court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Patel v. Parnes*, 253 F.R.D. 531, 544 (C.D. Cal. 2008).

Plaintiff alleges violations of Exchange Act Section 10(b) (15 U.S.C. § 78j(b)), SEC Rule 10b–5 promulgated thereunder (17 C.F.R. § 240.10b–5), and Section 20(a) (15 U.S.C. § 78t(a)). For each of these claims, Plaintiffs must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See* 17 C.F.R. § 240.10b–5; *see also Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 603 (9th Cir. 2014).

Private securities fraud actions must meet the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See* 15 U.S.C. § 78u–4; *Tellabs*, 551 U.S. at 313-14. Rule 9(b) requires the plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The PSLRA requires, *inter alia*, the plaintiff to: (i) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed" and (ii) "with respect to each [alleged] act or omission . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(1)(B), (b)(2)(A).

## IV.   ARGUMENT

Plaintiff fails to allege facts demonstrating any material misrepresentation or omission, scienter, and loss causation.

### A.   Plaintiff Fails to Allege Any Material Misrepresentation or Omission.

Plaintiff fails to adequately plead that any alleged misstatements or omissions are "false and misleading." PLDT addresses the challenged statements on a categorical basis below, but appends for the Court's benefit a chart listing each statement and the reasons (detailed herein) why they are not actionable.

### 1.   CapEx Statements

Plaintiff alleges that in 78 separate statements Defendants understated PLDT's CapEx spend. AC ¶¶ 9-10. The statements generally report PLDT's CapEx spend for prior reporting periods—such as a July 29, 2020 press release reporting PLDT's CapEx spend of ₱72.9 billion in 2019 (*id.* ¶ 141) and a statement on a May 7, 2020 earnings call that PLDT's "CapEx in first quarter came in at PHP 19.6 billion," *id.* ¶ 135. After each statement, the Complaint lists a set of reasons why it was purportedly false or misleading. *E.g.*, AC ¶¶ 128(b)-(g). As discussed below, these claims fail for the fundamental reason that none of the CapEx figures are false (PLDT has never restated its results), and for other reasons as well.

### a.   *Plaintiff fails to adequately allege that PLDT understated its prior CapEx spending.*

Plaintiff's allegation that PLDT understated its CapEx in prior reporting periods relies on the contention that PLDT "admitted" this in its Press Release. *E.g.*, AC ¶¶ 10, 108-10, 128(a). That allegation is inadequately alleged and implausible.

For one, the Press Release does not say that PLDT's prior CapEx spend was understated. Plaintiff highlights the portion of the release that says PLDT's "CapEx investments for these four years [*i.e.*, 2019-2022] aggregated PHP 379 billion, including an estimated budget overrun of no more than PHP 48 billion." *E.g.*, AC ¶ 312. Even if unclear, that passage does not say that PLDT's CapEx figures for prior reporting periods were understated, and nothing else in the release suggests that.

That Plaintiff mischaracterizes the "budget overrun" referenced in the release is evident from the text of the Press Release that Plaintiff ignores. The release goes on to say (in a passage Plaintiff selectively omits) that "CapEx *for 2023* will continue to be elevated *as the CapEx overruns enter the financial statements* this year and next," Ex. F at 1432 (emphases added), making clear that the "budget overrun" referenced in the release concerned CapEx PLDT expected to spend *in the future*. The Court can and should consider the full text of the release in evaluating Plaintiff's (implausible) allegation regarding the meaning of the "budget overrun" referenced in the release. *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1126 (N.D. Cal. 2020) ("Plaintiff may not simply cherry-pick portions of Defendants' statements and ignore other portions, but must instead account for the entirety of the statements on which they rely.") (cleaned up).[5]

The Special Call Plaintiff references and selectively quotes throughout the Complaint also makes clear that Plaintiff mischaracterizes the "budget overrun" referenced in the release. On that call, PLDT representatives confirmed that the "budget overrun" did not refer to PLDT's CapEx spend for prior reporting periods. Specifically, Defendant Pangilinan explained that, subject to ongoing internal review, "we have determined there is no fraud," "[t]here are no anomalies," no "evidence of over pricing," and no "unauthorized CapEx projects." Ex. B at 373. Rather, "[w]hat has happened is actually we have over ordered quite a bit of equipment and work to be done in these past 2 years, 2020 and 2021, principally," and "*the overruns will be used in the business in the next 3 or so years*." *Id.* (emphasis added). He later discussed when the "overrun" would be recorded by

_____

[5] *See also Roofer's Pension Fund v. Papa*, 2023 WL 5287783, at \*13 (D.N.J. Aug. 17, 2023) ("[Defendant's] actual words refute Plaintiffs' argument."); *id.* at \*14 ("When viewed in the proper context, [defendant's] statements on [the topic at issue] are not misleading. Rather, Plaintiffs have tried to manufacture an issue of fact for their [] Claim against [defendant] by mischaracterizing the record evidence and warping his words.").

14

PLDT: "Worst-case scenario on the impact of the PHP 48 billion CapEx overrun," if it was "all accepted next year," then it might "impact our balance sheet," but "like in any project, they don't complete normally in the year, so [the 48 billion] might flow over the following year." *Id.* at 375. Pangilinan explained that, from an accounting perspective, "of the PHP 48 billion, whatever assets flowing from that number will enter . . . what they call GR, goods received," *i.e.*, capital, "that enters operational use," that is when PLDT would "book those assets" and begin depreciating them. *Id.* at 379. In other words, the "budget overrun" referred to orders of capital that PLDT had placed, but not yet received, tested, accepted, recorded, or begun depreciating.

PLDT's subsequent 1Q disclosures further evidence that Plaintiff mischaracterizes the "budget overrun." In its March 23 Press Release, PLDT stated the "budget overrun" referenced in the release "represented management's estimate of the *outstanding commitments to its major vendors for the acquisition of property and equipment post-2022*." Ex. G at 1455 (emphasis added). PLDT also confirmed that based on substantial completion of its internal review, there was "no basis to restate the Company's historical financial statements." *Id.* The lack of any restatement underscores that the Press Release was not corrective of CapEx statements for the prior reporting periods that Plaintiff challenges. *See Reed v. Amira Nature Foods*, 2016 WL 6571281, at *12 (C.D. Cal. July 18, 2016) (dismissing complaint where fact that defendant's "revenue numbers have remained unchanged after a new auditor reviewed the papers and the audit committee conducted an independent investigation suggests that there was little, if anything, 'corrective' in the [research] reports"); *Harris v. AmTrust Fin. Servs.*, 135 F. Supp. 3d 155, 173 n.30 (S.D.N.Y. 2015) (lack of restatement indicated that defendant's later statement had not corrected a prior misstatement).

PLDT's annual report for fiscal year 2022, also submitted on March 23, 2023, shows mathematically that the ₱48 billion "overrun" did not concern CapEx spend

incurred in 2022 or earlier. In it, PLDT announced CapEx spend for 2022 of ₱96.8 billion (and reaffirmed previously reported CapEx figures for prior years). Ex. H at 1503. Together with the previously disclosed CapEx figures for 2019 (₱72.9 billion), 2020, (₱71.9 billion), and 2021 (₱89 billion), the total spend from 2019 through 2022 was ₱330.6 billion. The Press Release had announced that "CapEx investments for [2019-2022] aggregated [to] PHP 379 billion, including an estimated budget overrun of no more than PHP 48 billion." The difference between the reported CapEx spend for 2019 through 2022, ₱330.6 billion, and the ₱379 billion that PLDT disclosed in the Press Release, is ₱48 billion, confirming what PLDT has consistently reported: the ₱48 billion figure referred to *future* CapEx related to projects initiated during the 2019 to 2022 period.

Because true statements cannot give rise to a securities fraud claim, Plaintiff's claims based on CapEx statements for prior reporting periods should be dismissed. *See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) ("The statement in question must be false to be fraudulent."), *superseded by statute as stated in Avakian v. Wells Fargo Bank, N.A.*, 827 F. App'x 765 (9th Cir. 2020); *In re Redback Networks, Inc. Sec. Litig.*, 2007 WL 963958, at *5 (N.D. Cal. Mar. 30, 2007) ("Plaintiffs have not cited, and the Court has not discovered, any cases holding that the accurate reporting of revenues can constitute the basis of a securities fraud claim.").

**b.**    ***Plaintiff's bases for asserting that PLDT's CapEx-related statements were false or misleading are improper and inadequate to support a claim for relief.***

After Plaintiff quotes each of the CapEx-related statements he challenges, he offers a set of six or seven generic reasons (which he repeats after each challenged statement) as to why the statement was purportedly false and misleading. *E.g.*, AC ¶ 128. Courts in the Ninth Circuit have dismissed complaints that engage in similar pleading, as they "contravene applicable pleading standards by juxtaposing the same

16

series of generic conclusions against each set of block quotes, without differentiation or specificity." *McCasland v. FormFactor Inc.*, 2008 WL 2951275, at *7 (N.D. Cal. July 25, 2008); *Align Tech.*, 485 F. Supp. 3d at 1130-31 ("The Court explicitly warned Plaintiff that repeating the same basic background facts to show how each statement was false or misleading when made would be insufficient . . . [to] meet the higher, more exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA).") (cleaned up); *Patel v. Parnes*, 253 F.R.D. 531, 552 (C.D. Cal. 2008) (same). The Court should do the same here.

In any case, none of the reasons Plaintiff offers plausibly alleges why the identified CapEx statements were false and misleading.

*First*, Plaintiff alleges the statements were false because PLDT supposedly "admitted" in the Press Release that CapEx had been understated. *E.g.*, AC ¶ 128(a). As detailed *supra* Section IV.A.1.a, this allegation simply mischaracterizes the Press Release.

*Second*, Plaintiff alleges the statements were false because "[a]ccording to Defendants' own admissions during the Special Call, Defendants failed to disclose that the Head of Network, Head of Procurement and the CFO's Office failed to communicate about capital purchases and whether those purchases were within the Board-approved budget, or whether the equipment was timely deployed, which was a material cause of the budget overrun." *E.g.*, AC ¶ 128(b). But Plaintiff misrepresents what was stated during the Special Call. At no point were the Head of Network, Head of Procurement, or the CFO's Office mentioned. *See* Ex. B. And PLDT had no obligation to mention them. *In re GAP Sec. Litig.*, 1991 WL 17091, at *2 (9th Cir. Feb. 8, 1991) (no duty to disclose where a company did not make "an affirmative statement on the same subject which would be misleading absent disclosure of the information"). Even if the Special Call had addressed

17
DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

communication between those individuals, that does not raise a plausible inference that PLDT's CapEx figures for prior reporting periods were inaccurate.

*Third*, Plaintiff alleges the statements were false because "[a]ccording to Defendants' admissions during the Special Call, Defendants failed to disclose that PLDT's internal SAP records did not reconcile with its financial accounting records, requiring PLDT to 'reconstruct' its books to determine the extent of the budget overrun and the amount of vendor invoices that were unpaid." *E.g.*, AC ¶ 128(c). Again, the quality of PLDT's internal SAP system does not, standing alone, suggest that statements about CapEx spend for prior reporting periods were inaccurate. Furthermore, Plaintiff again misconstrues what was stated on the Special Call.[6]

*Fourth*, Plaintiff alleges the statements were false because "Defendants admitted in the Special Call that PLDT had material 'weaknesses' in its internal controls and systems over the four years from 2019 to 2022 which caused the budget overrun." *E.g.*, AC ¶ 128(d). Once again, Plaintiff misstates the Special Call. In his allegations Plaintiff quotes a single word, "weaknesses," which was not used during the Special Call—let alone a material weakness as Plaintiff alleges. *See* Ex. B. As discussed *infra* Section IV.A.3.a, Plaintiff fails to adequately allege that PLDT maintained inadequate controls or admitted otherwise during the Special Call.

*Fifth*, Plaintiff alleges the statements were false because "Defendants admittedly disregarded whether the capital spending figures they were reporting

---

[6] The only statement about the SAP system during the Special Call was made by Defendant Pangilinan. What Pangilinan actually stated was: "[T]he SAP records the transactions, right? So the data there is within the system. But the question is, to what extent are the accumulated and unspent CapEx reported at our level?" Ex. B at 378. The word "reconstruct" was not used in that discussion (as Plaintiff suggests), but, rather, was used in response to a question about advances paid to vendors. *Id.* at 383. There, Pangilinan explained that all advances are reflected in PLDT's financial statements. *Id.* at 384 (stating "there's a line in the balance sheet that says advances to vendors" and "all the payments to the vendors are reflected in the advances . . . so there is nothing that's not recorded").

18

were accurate (they were not) and, thus, their statements lacked any reasonable basis." *E.g.*, AC ¶ 128(e). Plaintiff, however, fails to identify any statements by any Defendant where this is admitted. In any case, this reason fails because, as discussed above, PLDT's CapEx figures were accurate. *See supra* Section IV.A.1.a.

*Sixth*, Plaintiff alleges that the statements were false because, as a result of the preceding items, "PLDT's [*sic*] was facing undisclosed cash flow problems and its business and operations were much worse than represented." *E.g.*, AC ¶ 128(f). Plaintiff fails to allege any facts supporting the existence of any such undisclosed cash flow problems. Even if he had, this allegation has no bearing on whether PLDT's reporting of CapEx spend for prior reporting periods was accurate. It is also not a plausible allegation on its own, as it is predicated on the preceding reasons Plaintiff lists (which, as discussed above, lend Plaintiff no support).

*Seventh*, Plaintiff alleges at times that certain of these statements were false because "[i]n May 2022, after suppliers such as Huawei complained about not being paid for overdue invoices, Defendant Panlilio (CEO) checked PLDT's records and learned that SAP and the Company's financial records did not match because SAP included unpaid purchase orders not recorded in PLDT's accounting records." *E.g.*, AC ¶ 222(c). Even if accepted as true, Plaintiff pleads no facts demonstrating how it follows from this allegation that PLDT's reporting of CapEx spend for prior reporting periods was inaccurate. Moreover, the allegation ignores that the Press Release and the Special Call were clear that there were no unrecorded CapEx transactions. *See supra* Section II.D.

Finally, Plaintiff alleges at times that "[a]s a result of the above, the above risk factor lacked any reasonable basis," AC ¶ 130(f), and that "[a]s a result of the above, Defendants' statements lacked any reasonable basis." *E.g.*, AC ¶ 134(f). These reasons fail because they depend on the preceding reasons Plaintiff lists, each of which fails. Moreover, Plaintiff fails to allege any facts supporting the inference that Defendants' statements lacked reasonable basis. *See GlenFed*, 42 F.3d at 1548.

### c. *Forward-looking CapEx statements Plaintiff challenges are protected by the PSLRA's safe harbor provision.*

Approximately seventeen of the CapEx-related statements Plaintiff challenges contain nonactionable forward-looking statements under the PSLRA's Safe Harbor Provision.[7] *See* Appx. A, statements 5, 7, 13, 15, 16, 21, 23, 32, 35, 41, 42, 44, 47-49, 56, 57, 66, and 78. A representative example of the forward-looking CapEx statements at issue is: "**[O]ur sense is that next year, we should be able to bring the CapEx down to probably closer to what it was before 2021**." AC ¶ 189 (quoting statement during PLDT's August 5, 2021 earnings call).[8]

Under the PSLRA, "a defendant will not be liable for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading." *In re Quality Sys.*, 865 F.3d at 1141. Although Plaintiff alleges the safe harbor does not apply because none of the forward-looking statements were accompanied by sufficient cautionary language, AC ¶¶ 412-13, that assertion is wrong as matter of law. "Even if a forward-looking statement is not accompanied by adequate cautionary language, it is protected by PSLRA's safe harbor if the speaker did not have 'actual knowledge' that the statement was false or misleading." *In re Quality Sys*, 865 F.3d at 1149.

---

[7] Some of the 78 CapEx statements Plaintiff challenges are "mixed" statements. Because of the need to address the forward-looking and opinion portions of mixed statements separately, these statements are addressed in multiple sections of this memorandum. This section addresses only the forward-looking portions of these statements. The portions of these statements that are inactionable because they are statements of opinion are addressed *infra* Section IV.A.1.d. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017) (mixed statements should be analyzed according to each of the components of the statement).

[8] The Complaint indicates statements alleged to be false and misleading are bolded and underlined. AC ¶ 36 n.31. Statements are reproduced here with that same formatting.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

Here, Plaintiff has not sufficiently alleged (and cannot) that any speaker had actual knowledge the challenged forward-looking CapEx statements were false or misleading, because, as discussed above, the statements at issue are true. Plaintiff generically alleges that "at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of the Company who knew that the statement was false when made." AC ¶ 414. But this generalized allegation falls short of the stringent pleading standard governing "actual knowledge of falsity" for forward-looking statements. *GlenFed*, 42 F.3d at 1548-49 ("[T]here is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation, and that therefore simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false. . . . [A] plaintiff must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading *when made*.").[9]

_____

[9] Statements 55 and 78 fail for additional reasons. Plaintiff quotes two words—"financial discipline"—in statement 55, strips them of their context, and places them in a self-serving context that transforms the meaning. AC ¶ 204 ("[D]uring the March 3, 2022 Earnings Call, analysts asked how the company is planning to rationalize these capital expenditures, to which Defendant Chua ensured they had the 'financial discipline' to manage the increases in capital expenditures[.]"); *id.* ¶ 371 (quoting transcript of call making clear that Chua was speaking about EBITDA, cash flow, and payment of dividends); *see Roofer's Pension Fund*, 2023 WL 5287783, at *13-14 (plaintiff may not strip statements of their context in an attempt to manufacture falsity). Plaintiff fails to plead statement 78 with particularity because he fails to identify the party making the statement. AC ¶ 235 (quoting an "Unknown Executive" as stating "We again continue to invest on a lot of CapEx item. . . . It is elevated at this point. Hopefully, we're looking at the glide path and 1 to 2 years, maybe that we're keeping the envelope maybe at the more PHP 85 billion per year."). *See Alan Neuman Prods., Inc. v. Albright,* 862 F.2d 1388, 1392-93 (9th Cir. 1988) ("[T]he pleader must state the time, place, and specific content of the false

#### d. *As to opinion CapEx statements, Plaintiff fails to allege that the maker did not believe them to be true when made.*

Approximately 14 of the challenged CapEx statements contain nonactionable statements of opinion. *See* Appx. A, statements 7, 9, 13-15, 21, 27, 41, 44, 48, 56, 57, 66, and 78.[10] Representative examples of the forward-looking CapEx statements at issue include the statements "**we believe that we have a chance to ramp down our CapEx to somewhere below the 40% CapEx-to-sales ratio and effectively harvest some of the investments we've made**," AC ¶ 204 (quoting PLDT's March 3, 2022 earnings call), and "**So we like to bring that down, moving forward, to maybe in the level of 35%. So that's something that, [in terms of] discipline, I think Anabelle was saying that we should be able to bring down our CapEx**," AC ¶ 205 (quoting PLDT's March 3, 2022 earnings call).

These statements are all "generalized, vague and unspecific assertions" of confidence that are insufficient to meet the PSLRA's heightened pleading requirement. *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003); *see also Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016) ("vague, optimistic statements" by company officials are not actionable); *In re VeriFone Sec. Litig.*, 784 F. Supp. 1471, 1481 (N.D. Cal. 1992) (investors "know how to devalue the optimism of corporate executives"), *aff'd*, 11 F.3d 865 (9th Cir. 1993). "The Ninth Circuit has defined the point at which an opinion statement projecting optimism becomes an actionable, 'factual' misstatement under section 10(b), namely, when (1) the statement is not actually believed, (2) there is no

representations *as well as the identities of the parties to the misrepresentation*.") (emphasis added).

[10] As noted previously, some of the statements Plaintiff identified are "mixed" statements. This section addresses only the portions of those statements that are inactionable opinion statements. The Appendix lists the other reasons that statements are nonactionable.

22

reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1200 (N.D. Cal. 2008). To plead falsity with respect to opinion statements, a complaint must "contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the . . . misleading nature of the statements when made." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001). Plaintiff alleges no such facts.

### 2.   5G Rollout Statements

Plaintiff alleges that certain statements about PLDT's rollout of 5G were false and misleading because they suggested the 5G rollout was ongoing when, Plaintiff alleges, it had "stopped" in 2021. *See* Appx. A, statements 79-88. Representative examples of the 5G Rollout statements at issue are: "**we are a full blast on 5G rollout**," AC ¶ 237 (quoting a statement during PLDT's March 4, 2021 earnings call) and "we are confident that as full mobility resumes and economy activity increases*,* **and combined with the increasing adoption of 5G**, **we will see an uptick in Individual wireless revenues**," AC ¶ 245 (quoting PLDT's March 3, 2022 Press Release). These statements are not actionable for several reasons.

*First*, Plaintiff fails to allege that the statements were false or misleading. Pointing to excerpts from the Special Call, Plaintiff alleges the statements were false because PLDT representatives said (i) PLDT "decided in 2021, we should not be as aggressive in 5G," but continued purchasing 5G equipment, (ii) PLDT "decided to temper and stop the rollout" in 2021 because "the commercial response was not attractive," and (iii) "5G adoption has been very, very slow." *E.g.*, AC ¶ 238 (and repeated following each 5G rollout statement). These statements, Plaintiff alleges, reveal that PLDT had stopped the 5G rollout in 2021 but told the market otherwise. But on review of the transcript of the Special Call, it is apparent that Defendants did not mean what Plaintiff alleges they did.

During the Special Call, Victorio-Aquino mistakenly said that PLDT had decided to "stop" the rollout, but immediately after, Panlilio corrected that statement:

Marilyn A. Victorio-Aquino

. . .

There are 2 incidents basically -- 2 points here. It's -- the first is the rollout of the 5G. The initial – we ordered the hardware. The initial rollout did not attract a lot of users. So *we decided to stop the rollout* and -- but this 5G hardware that are here, we intend to re-purpose them for 4G, the roll -- the LTE rollout next year because the same hardware will be used. We just need to buy a different license.

. . . .

Alfredo S. Panlilio

. . .

Yes, *just to sort of slightly correct that*. I think it's happened globally, right? 5G adoption has been very, very slow. So there was a major push in those 5G. *We're not something stopping it, but we're choosing the areas*, but the focus now really will be on 4G LTE, where the majority of our customers, 80% to 90%, and there are areas where capacity is an issue. Congestion is happening. So very targeted expansions on 4G LTE, for sure. *5G slowed down*, but very targeted only.

Ex. B at 380. (emphases added). Thus, in context, the discussion during the Special Call clearly explained that PLDT planned for a large rollout of 5G technology, the market did not respond, and PLDT pivoted accordingly; PLDT did not "stop" the 5G rollout, as Plaintiff alleges. PLDT explained that, rather than focusing on 5G, it shifted its focus to "targeted expansions on the 4G LTE" network that served approximately "80% to 90%" of its customers and repurposed its 5G assets to support 4G LTE. *Id.* Plaintiff cannot rely on "cherry-picked" excerpts of the Special

24

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

Call in an effort to allege otherwise. *See Align Tech.*, 485 F. Supp. 3d at 1128 ("Plaintiff's interpretation of [Defendant's] statement is implausible because it conveniently omits portions of the statement."); *Roofer's Pension Fund*, 2023 WL 5287783, at *13 ("To make this argument, Plaintiffs ignore what [Defendant] said a few breaths before. . . . [Defendant's] actual words refute Plaintiffs' argument.").

*Second*, some of the statements Plaintiff challenges are too vague to be actionable. *See* Appx. A, statements 79, 81, 83. For example, Plaintiff alleges this statement was false: "**[A]nd combined with the increasing adoption of 5G, we will see an uptick in Individual wireless revenues**." AC ¶ 245 (quoting PLDT's March 3, 2022 Press Release). But "[i]ncreasing adoption of 5G" is not inconsistent with statements on the Special Call that adoption of 5G technology was slower than expected; both can be true. That is made clear when reading a broader portion of the March 3, 2022 Press Release, which explained (in text omitted from the Complaint) that "fourth quarter data traffic on Smart's 5G network grew by 72% compared with the previous quarter." Ex. I at 2059. It is for this reason, that vague and unspecific statements, like "[i]ncreasing adoption," are generally not actionable. *Lloyd*, 811 F.3d at 1207.

*Third*, some of the statements about 5G Plaintiff challenges are nonactionable forward-looking statements under the PSLRA's safe harbor provision. *See* Appx. A, statements 79-85, 87, 88. For example, Plaintiff alleges the following statement, made during PLDT's March 3, 2022 earnings call, was false: "In 2021, we had successfully grown our 5G mobile subscriber base to north of 1 million. **And we're looking at growing that to more than double this year**." AC ¶ 248. This statement, of course, is not inconsistent with the business decision to slow down and be more targeted with the rollout of 5G infrastructure. Importantly, Plaintiff has not alleged any facts demonstrating that the statement's maker had actual knowledge the statement was false when made. The Complaint thus falls far short of the stringent

25

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

pleading standard governing "actual knowledge of falsity" for forward-looking statements. *GlenFed*, 42 F.3d at 1548-49.

### 3. Internal Controls Statements

Plaintiff alleges 12 statements relating to internal controls were false and misleading. *See* Appx. A, statements 89-100. The statements include:

- Sarbanes Oxley ("SOX") certifications by Defendants Pangilinan and Chua in which they certified, based on their knowledge, that PLDT maintained "adequate" internal controls over financial reporting, AC ¶¶ 256, 259, 266, 272;

- a section in PLDT's 2019, 2020, and 2021 Forms 20-F containing controls and procedures certifications by Defendants Pangilinan and Chua in which they certified, based on their assessment, that PLDT's disclosure controls and procedures, and internal controls over financial reporting were "effective," AC ¶¶ 261, 267, 273;

- statements in PLDT's 2020 Form 20-F warning about the risk that PLDT may fail to maintain "effective" or "adequate" internal controls over financial reporting, AC ¶¶ 263, 264; and

- a statement in a press release issued on November 4, 2021 stating that "**PLDT's listing on the NYSE has required the company to also comply with the US Securities and Exchange Commission's (SEC) governance standards, including Sarbanes Oxley Act Section 404 requirements for internal controls over financial reporting**," AC ¶ 270.

For the reasons discussed below, Plaintiff fails to plead any of these statements were false and misleading.

### a. *Plaintiff fails to adequately allege that the internal controls statements were false or misleading.*

As a preliminary matter, all of the internal controls statements Plaintiff challenges are nonactionable because generalized statements about internal controls

26

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

over financial reporting are nonactionable under the PSLRA. *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 977 (N.D. Cal. 2015) (allegations that statements in annual filings about defendant's evaluation of the effectiveness of its internal controls over financial reporting were false and misleading are "nothing more than a nonactionable generalized claim of mismanagement") (cleaned up). The Court "cannot simply assume there was mismanagement and internal controls were inadequate simply because" of some later announcement by Defendant. *Id.* at 978. Moreover, even if the Court could make such an assumption, Plaintiff still has not pleaded (as he must) "how, if at all, [PLDT's] internal controls were actually inadequate." *Id.*

In any case, following each internal controls statement, Plaintiff repeats the same set of generic reasons why the statement is allegedly false and misleading. But none of the reasons Plaintiff offers plausibly alleges why the identified statements were false and misleading. *Align Tech., Inc.*, 485 F. Supp. 3d at 1129 ("[T]he factual allegations that Plaintiff did provide lack the requisite nexus with the actual content of [defendant's statement] to show how the statement is false.").

*First*, Plaintiff alleges the statements were false because, as a "result[]" of PLDT's inadequate internal controls, PLDT incurred "unrecorded and unreported" CapEx that comprised the "budget overrun" disclosed in the Press Release. *E.g.*, AC ¶ 260(i). Plaintiff's punchline swings and misses. As discussed, the Press Release did not disclose that any statements regarding CapEx for prior reporting periods, or otherwise, were inaccurate. *See, supra* IV.A.1.a. Furthermore, no matter how many times Plaintiff repeats his assertion that there were "unrecorded and unreported" capital expenditures, he cannot magically transform Defendants' statements that say the opposite. *See supra* Section IV.A.1.a-b; *see also Patel*, 253 F.R.D. at 544 ("The court is 'not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint.'").

*Second*, Plaintiff alleges the statements were false because Defendants purportedly "admitted" in the Press Release that the "budget overrun" was the result of "weaknesses" in PLDT's internal controls. *E.g.*, AC ¶ 260(g). What the Press Release actually said, however, is that PLDT was "undertaking a *management reorganization process and ha[d] initiated *improvements on its processes and systems* to address weaknesses that allowed [the] budget overruns to occur." Ex. F at 1432 (emphases added). That statement does not admit the controls were "inadequate." Moreover, the statement also says nothing of internal controls over *financial reporting*. Rather, since the "budget overrun" referred to orders of CapEx that had been placed but not yet received or accounted for as CapEx, that statement is unrelated to Plaintiff's claim. *See also Rok v. Identiv, Inc.*, 2017 WL 35496, at *6-7 (N.D. Cal. Jan. 4, 2017), *aff'd*, 716 F. App'x 663 (9th Cir. 2018) (disclosure of one "weakness" does not presuppose that other unrelated weaknesses exist).

The remaining reasons Plaintiff lists are all based on alleged admissions during the Special Call. Plaintiff alleges the statements were false because PLDT "admitted" in the Special Call that (a) it "was not monitoring projects internally to ensure they were being completed on time and in accordance with budget"; (b) the "network monitoring system," and the "procurement monitors has got to be tightened—really tightened. So we know how every peso is spent"; (c) "'accumulation of this CapEx,' was not reported to the Board of Directors, nor did anyone from management or at the Board level ask questions about it to inform themselves whether PLDT was spending according to the Board-approved annual budget, whether projects were being completed on time or whether the capital expenditure number publicly reported each quarter was accurate"; (d) "the Head of Networks, Head of Procurement, and the CFO did not communicate or coordinate efforts throughout 2019 to 2022 to ensure PLDT only approved purchase of equipment that was necessary for construction and that PLDT's spending did not exceed the budget and, thus, PLDT over-ordered capital equipment throughout 2019

through 2022 with large quantities of equipment sitting in warehouses not being used"; and (e) "the SAP system included undocumented purchase orders" and "there were discrepancies between PLDT's SAP system and its financial records and, thus, PLDT had to 'reconstruct the books.'" *E.g.*, AC ¶¶ 260(a)-(f).

Like the alleged admission in the Press Release, these statements do not relate to internal controls over financial reporting, but, rather, all relate to PLDT's processes for monitoring the levels of CapEx orders. For example, Defendant Panlilio's statement that "project management needs improvement internally," *e.g.,* AC ¶ 260(a), was in response to an analyst's question about whether there was a risk that the "budget overrun" of *future* CapEx might exceed ₱48 billion, Ex. B at 379 (Special Call).

Plaintiff mischaracterizes the Special Call to attempt to create the impression that internal controls over financial reporting were at issue. They were not. No fact alleged in the Complaint supports Plaintiff's assertion that management did not "inform themselves about whether . . . the capital expenditure number publicly reported each quarter was accurate." *E.g.*, AC ¶ 260(c). Defendant Pangilinan made clear in response to a question regarding the nature of the "budget overrun" that management took care to ensure that "when we report to you, we tell you what the CapEx for the year was actually spent" Ex. B at 383.

b.   ***Plaintiff fails to allege any Defendant made representations about internal controls with actual knowledge they were false.***

Even if Plaintiff had adequately pleaded that PLDT's internal controls over financial reporting were inadequate or public filings were inaccurate—which he has not, as discussed in the preceding section—that is not enough to demonstrate falsity with respect to this category of statements. Each of the internal controls statements Plaintiff identifies are statements of opinion. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015) (statements that

make clear they are based on the speaker's belief and not objective fact are opinion); *see also In re AmTrust Fin. Servs., Inc. Sec. Litig.*, 2019 WL 4257110, at \*24 (S.D.N.Y. Sept. 9, 2019) ("The [SOX] attestation is a statement of opinion."). Here, the statements Plaintiff challenges are accompanied by language making clear that they are opinions. Appx. A at statements 89-94 ("Based on my knowledge"); *id.* at statements 95, 98, 100 ("Based on this assessment, management has determined"); *see also N. Eng. Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 2023 WL 5419147, at \*11 (2d Cir. Aug. 23, 2023) ("SOX certifications relating to (1) disclosure controls and procedures, and (2) internal control over financial reporting contain language that conveys management's subjective judgments about the company's internal controls and thus constitute statements of opinion."). Because these are statements of opinion, Plaintiff must plead facts sufficient to allege the individual who made the statements did not actually believe them to be true at the time they were made. *Omnicare*, 575 U.S. at 186. Plaintiff has not done so. He instead alleges that the later announced "overrun" must mean that the earlier belief was wrong. That is insufficient because "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless of whether an investor can ultimately prove the belief wrong." *Id.* Plaintiff pleads no facts to support a plausible inference that Defendants believed the internal controls to be inadequate but represented otherwise.[11]

---

[11] Plaintiff has failed to sufficiently plead that the three remaining internal controls statements were false or misleading. Appendix A statements 96 and 97 warn of the risks associated with internal controls. But Plaintiff does not allege that the content of these statements was false or misleading. Rather, he alleges that the risks had materialized as evidenced by the same "reasons" he lists following each internal controls statement. AC ¶ 265. As discussed *supra*, all of the reasons fail because they relate to CapEx commitments and not to internal controls over financial reporting. Statement 99 touts PLDT's commitment to "the highest standards of business ethics and corporate governance." Appx. A, statement 99. This statement is a classic example on nonactionable puffery. *Lloyd*, 811 F.3d at 1207 ("vague, optimistic statements" by company officials are not actionable).

#### 4.   Depreciation and Net Income Statements

Plaintiff identifies 12 statements relating to depreciation that he alleges were false and misleading. *See* Appx. A, statements 101-12. Representative examples of the depreciation statements at issue are:

- "**[C]onsolidated depreciation and amortization expense for the year-ended December 31, 2019 of PHP 39.656 billion and 2019 net income of PHP 22.786 billion**." AC ¶ 276 (citing 2019 Form 20-F).

- "**[C]onsolidated depreciation and amortization expense for the three months-ended March 31, 2021 of PHP 11.721 billion and net income for the quarter of PHP 5.874 billion**." AC ¶ 291 (citing May 6, 2021 Form 6-K, May 6, 2021 Press Release, and May 6, 2021 Earnings Call).

Plaintiff alleges the falsity of PLDT's past statements of depreciation was revealed by the Special Call, AC ¶ 14. But Plaintiff's allegations are based on a fundamental misunderstanding that the "accelerated depreciation" announced in the Special Call was the depreciation of assets related to the ₱48 billion CapEx "overrun." *E.g.*, AC ¶¶ 277-78. No statement during the Special Call suggested that the accelerated depreciation expense announced on the call had anything to do with assets acquired in relation to the CapEx "overrun." In fact, PLDT explicitly stated this was not the case. Ex. B at 381 ("PHP 48 billion has been established to be useful in operations. So they're not going to get written down. The assets that he was referring to that will be written down is based on a review of the older assets within the network, which I guess is a regular exercise."). PLDT explained that the commitment to future expansion and future CapEx projects would likely result in an accelerated depreciation of *existing*, already deployed, older assets. *Id.* at 379. Further, assets for future projects, including those assets already delivered, would not be subject to depreciation until the asset was deployed for use—consistent with standard accounting practices. *Id.* at 377. Plaintiff's misguided belief, based on misrepresentation of statements during the Special Call, are inadequate to state a

claim. *Align Tech.*, 485 F. Supp. 3d at 1126 ("Plaintiff may not simply cherry-pick portions of Defendants' statements and ignore other portions, but must instead account for the entirety of the statements on which they rely.") (cleaned up); *Roofer's Pension Fund*, 2023 WL 5287783, at *13-14 (holding that plaintiff impermissibly stripped defendant's statements of their context in an attempt to allege falsity).

Plaintiff also ignores that if his theory regarding the accelerated depreciation were accurate—that it was "taken to catch up for prior years' unrecorded depreciation expense," *see, e.g.*, AC ¶ 278—the remedy is a restatement. But here, following the completion of its internal investigation, PLDT did not issue any restatement of depreciation expenses, net income, or otherwise. Ex. G at 1455 (March 23 Press Release: forensic accounting review found "no basis to restate the Company's historical financial statements"); *see also Reed*, 2016 WL 6571281, at *12 (lack of later restatement suggested no revelation of inaccuracy); *AmTrust Fin. Servs.*, 135 F. Supp. 3d at 173 n.30.

Furthermore, PLDT's 2022 Annual Report details which assets were subject to accelerated depreciation. Ex. H at 1547-48 (2022 Form 20-F). Those assets were the very assets that PLDT explained in the Special Call would be depreciated—they are not, as Plaintiff claims, assets that are the subject of the CapEx "overrun," some of which, as of the end of fiscal year 2022, had not even been received. *See* Ex. B at 380 (Special Call: listing assets subject to accelerated depreciation).

**B.     Plaintiff Fails to Plead Scienter**

Plaintiff fails to meet the high standard required to plead scienter. A securities fraud complaint must state "with particularity" facts giving rise to "a strong inference" that the defendant acted with intent to deceive, manipulate, or defraud. *See* 15 U.S.C. § 78u-4(b)(2); *see also Tellabs*, 551 U.S. at 313-14 (to be "strong," an inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent"). To

adequately demonstrate that the "defendant acted with the required state of mind," a complaint must "allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009).

Because the Complaint offers allegations of recklessness, it bears emphasizing that recklessness means "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Zucco*, 552 F.3d at 990-91. To satisfy the recklessness standard, it is not enough to "aver intent in general terms of mere 'motive and opportunity' or 'recklessness.'" *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 979 (9th Cir. 1999). Rather, a complaint must "state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Id*. This means that the complaint "must contain allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Metzler*, 540 F.3d at 1066.

A court reviewing scienter allegations should "conduct a dual inquiry: first, [it should] determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient, [it should] conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Zucco*, 552 F.3d at 992.

For the reasons discussed below, because Plaintiff fails to allege any particularized facts showing that PLDT or any of the other Section 10(b) Defendants acted with a degree of recklessness that strongly suggests actual intent, Plaintiff's Section 10(b) claim should be dismissed.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

### 1. Plaintiff's Allegations, Standing Alone, Do Not Create a Strong Inference of Scienter

As for the first step of the two-step scienter inquiry, Plaintiff offers several theories as to why scienter should be imputed to Defendants. *See* AC ¶¶ 352-96. Taking each in turn, none meets the applicable pleading standards.

#### a. *Defendants' Alleged Desire to "Address Competitive Pressures."*

Plaintiff alleges that Defendants were motivated to engage in the alleged fraud by a desire to address competitive market pressures caused by then-Philippine President Rodrigo Duterte, which purportedly motivated Defendants to "embark[] on a massive capital expenditure spending spree" to expand services and protect "market share." *See* AC ¶¶ 387-96. But these allegations do not support an inference of scienter.

*First*, merely alleging that Defendants had a "motive to mislead" is insufficient. *Jiangchen v. Rentech, Inc.*, 2018 WL 11513254, at *8 (C.D. Cal. Nov. 1, 2018) (finding plaintiff's argument that "[d]efendants had a motive to mislead" insufficient to establish scienter); *see also In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d at 979 ("[U]nder the PSLRA, [plaintiffs] can no longer aver intent in general terms of mere 'motive and opportunity' or 'recklessness.'").

*Second*, even if Plaintiff could rely on mere motive allegations, allegations like those Plaintiff offers of routine corporate objectives, "such as the desire to . . . expand," are insufficient. *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012) ("[T]o hold otherwise would support a finding of scienter for any company that seeks to enhance its business prospects.").

*Third*, the absence of allegations that any Defendant sold shares (and thus was personally enriched) while PLDT's stock price was allegedly artificially inflated "further undercut[s] their allegations of scienter." *May v. KushCo Holdings, Inc.*, 2020 WL 6587533, at *9 (C.D. Cal. Sept. 25, 2020); *see also Webb v. Solarcity*

*Corp.*, 884 F.3d 844, 856 (9th Cir. 2018) ("[W]e have recognized that a lack of stock sales can detract from a scienter finding."); *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1107 (9th Cir. 2021) ("Generally, we expect that a financial motive for securities fraud will be clear; for example, someone inside a company stands to gain a substantial profit by engaging in deceptive behavior, such as selling shares before the company discloses negative information.").

### b.    *PLDT's Alleged "Admission" That It Failed to Track/Monitor CapEx Spending.*

Plaintiff alleges that Defendants' deliberate recklessness is demonstrated by Pangilinan's statements on the Special Call that (i) senior management and the Board had access to CapEx information during the Class Period and that the Board "should have inquired about the accuracy" of the Company's reported figures as compared to the budget before reporting to the market, and (ii) the Board was "remiss" for "not tracking or monitoring PLDT's capital spending" during the Class Period. AC ¶¶ 354-55. These allegations also do not support any inference of scienter.

*First*, Plaintiff's allegations do not demonstrate (as they must) any "extreme departure from the standards of ordinary care." *Zucco*, 552 F.3d at 990-91. Plaintiff must plead with particularity facts demonstrating that Defendants actually knew that their statements were inaccurate when made. *See Strasburger v. Blackburne & Sons Realty Cap. Corp.*, 2020 WL 6128069, at *14 (C.D. Cal. Apr. 22, 2020) (Carney, J.). Absent allegations (missing here) of what specific information related to the fraud was conveyed to management, allegations like Plaintiff's (of the Board's general access to or awareness of CapEx information) are indistinguishable from allegations of access to day-to-day workings that courts routinely find insufficient. *E.g.*, *Metzler*, 540 F.3d at 1068 ("[M]anagement's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some specific additional allegation of specific information conveyed to management and related to the fraud."); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th

Cir. 2002) (conclusory allegations of access to internal data allegedly contrary to public statements insufficient where plaintiffs did not plead, in any detail, the contents of the purported data: "Without this information . . . we cannot ascertain whether there is any basis for the allegations that the officers had actual or constructive knowledge . . . that would cause their optimistic representations to the contrary to be consciously misleading.").

*Second*, Plaintiff's allegations (that Defendants "should have" inquired further and were "remiss" in not doing so) describe, at most, ordinary corporate mismanagement or negligence, which is insufficient to establish scienter (and, in any event, the allegations are false). *Prodanova*, 993 F.3d at 1103 ("Mere negligence— even head-scratching mistakes—does not amount to fraud."); *see also In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1089 (C.D. Cal. 2008) ("Federal securities laws do not create a cause of action for corporate mismanagement that is not accompanied by deception."); *Buttonwood Tree Value Partners LP v. Sweeney*, 910 F. Supp. 2d 1199, 1204 (C.D. Cal. 2012) ("The majority of the purported red flags are not red flags at all because they suggest poor decision-making, not fraud."); *Strasburger*, 2020 WL 6128069, at *13-16 (allegations of mere negligence inadequate).

### c.  *Individual Defendants' Access to CapEx Information.*

Plaintiff alleges that Defendants' recklessness is demonstrated by Defendant Pangilinan's "admission" on the Special Call that each and every Individual Defendant had access to PLDT's SAP system and records but "never inquired about whether PDLT's capital spending" reconciled with the annual budget before reporting CapEx spent to the market. AC ¶¶ 357-58. Plaintiff also alleges that Pangilinan "admitted" during the Special Call that PLDT's Network, Procurement and Finance groups "did not coordinate or communicate at all" during the Class Period "to ensure the budget overruns did not occur." AC ¶¶ 360, 375. These

36
DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

allegations are no more adequate than Plaintiffs' other "access to information" allegations.

*First*, general allegations, like Plaintiff's, about corporate officers' access to internal allegedly contrary data are insufficient. An allegation of recklessness based on supposed access to contrary facts must specifically identify the reports or statements containing the contrary information, the substance of the contrary information, and that the defendant reviewed the reports containing the contrary information. *See Lipton*, 284 F.3d at 1036 (allegations of defendants' "access to internal data demonstrating a decline in sales" were insufficient because plaintiff did not allege with particularity that any specific information in the data was contrary to public statements, even though plaintiff referred to existence of data and generally asserted what it showed); *Zucco*, 552 F.3d at 1000 (allegation "that senior management . . . closely reviewed the accounting numbers generated . . . each quarter (through the use of the Access databases), and that top executives had several meetings in which they discussed quarterly inventory numbers" insufficient); *In re Am. Apparel, Inc. S'holder Litig.*, 2013 WL 174119, at *28 (C.D. Cal. Jan. 16, 2013) ("General references to reports defendants may or may not have received do not aid plaintiffs, as the complaint contains no information concerning the content of the reports, and no allegations that reviewed reports containing damning information."). Plaintiff fails to offer any such allegations regarding PLDT's SAP system and records, and alleges to the contrary that "Defendants never inquired." AC ¶ 358; *see Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) ("Missing are allegations linking specific reports and their contents to the executives . . . ."). Plaintiff instead relies on mere negative characterizations of the SAP system and records—the type of allegation the Ninth Circuit deems insufficient. *See Lipton*, 284 F.3d at 1036 ("[N]egative characterizations of reports relied on by insiders, without specific reference to the contents of those reports, are insufficient . . . .").

37

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

*Second*, Plaintiff's allegation that PLDT's Network, Procurement and Finance groups "did not" coordinate during the Class Period (but should have) to ensure that budget overruns did not occur is at most an inadequate (and denied) allegation of corporate mismanagement or negligence. *See supra* Section IV.B.1.b.

### d.    *Alleged "Admission" That PLDT Lacked Internal Controls.*

Plaintiff alleges that Defendants' recklessness is demonstrated by: (i) PLDT's Press Release stating that PLDT "has initiated improvements on its processes and systems to address weaknesses that allowed such budget overruns to occur"; (ii) a statement Defendant Pangilinan made on the Special Call that "the networking monitoring system or the procurement monitors has got to be tightened" and that the Board was "remiss" in its oversight; (iii) a statement Defendant Victorio-Aquino made on the Special Call that the Board "normally do[es] not have a daily or monthly report on the status of" network build projects; and (iv) a statement Defendant Panlilio made on the March 23, 2023 2022 Earnings Call that PLDT "was implementing controls and enhancements in policies and procedures over budget planning approvals and monitoring, as well as making improvements to project management systems and data systems to ensure sure the Company is equipped to efficiently monitor and optimize CapEx spending, as well as making improvements to the vendor management processes." AC ¶¶ 362-66. Each of these allegations is insufficient because allegations of purportedly "weak" internal controls are as a matter of law insufficient to establish scienter where, as here, the plaintiff fails to plead "specific facts indicating that any of the Individual Defendants recklessly disregarded or intentionally exploited internal control deficiencies." *Okla. Firefighters Pension & Ret. Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1364-65 (C.D. Cal. 2014) ("Mere allegations that [defendant] had deficient internal controls are insufficient to give rise to a strong inference of scienter.") (collecting cases); *see also Kaplan v. Charlier*, 426 F. App'x 547, 549 (9th Cir. 2011) ("At most the complaint

alleges facts sufficient to show that the GPI's management was negligent in failing to ensure adequate internal controls and accounting staff, but negligence is an insufficient scienter for securities fraud."); *Karpov v. Insight Enters., Inc.*, 2010 WL 2105448, at *10 (D. Ariz. Apr. 30, 2010) ("Allegations that Insight had material weaknesses in its internal controls do not, standing alone, give rise to a strong inference of scienter on the part of the company or its executives.").

### e. *Certain Individual Defendants' "Detailed" Responses to Analyst Questions.*

Plaintiff alleges that Defendants' recklessness is demonstrated by the "detailed answers" about CapEx that Defendants Chua, Pangilinan, and Panlilio gave during earnings calls during the Class Period in response to analysts' "pointed" questions—purportedly indicating a high level of personal knowledge on the subject. AC ¶¶ 368-73. But these allegations are materially no different than Plaintiff's equally insufficient allegations of general access to information discussed *supra* Section IV.B.1.b. That these Defendants provided responses to questions on earnings calls demonstrates at most "general awareness of the day-to-day workings of the company's business," which the Ninth Circuit has held "does not establish scienter." *Metzler*, 540 F.3d at 1068.

### f. *Membership on PLDT's Technology Strategy Committee.*

Plaintiff alleges that Defendants' recklessness is demonstrated by Defendants Pangilinan and Panlilio's memberships on PLDT's Technology Strategy Committee, because that committee reviewed CapEx requests before submitting them to the Board for approval, and thus, these individuals allegedly had "unrestricted access to management and information" which in turn allegedly creates a strong inference that Defendants Pangilinan and Panlilio were aware of, or recklessly disregarded, the budget overrun. AC ¶¶ 374-76.

But general allegations about access to information based on participation in corporate committees are insufficient to establish scienter absent allegations (missing here) about what any defendant knew or believed at the time the allegedly false or misleading statements or omissions were made by virtue of access to information as a result of that participation. *See In re Downey Sec. Litig.*, 2009 WL 736802, at *9 (C.D. Cal. Mar. 18, 2009) ("It also is insufficient to demonstrate a strong inference of scienter for Plaintiff to allege that certain of the Individual Defendants held positions on various committees[.]"); *In re Lockheed Martin Corp. Sec. Litig.*, 272 F. Supp. 2d 944, 956 (C.D. Cal. 2003) (no scienter even where defendant allegedly "received regular updates" as a member of the company's finance committee via reports on the status of company's major projects); *In re Silicon Storage Tech., Inc. S'holder Deriv. Litig.*, 2009 WL 1974535, at *11 (N.D. Cal. July 7, 2009) (collecting cases); *see also supra* Sections IV.B.1.b. & c.

### g.    *Management Reorganization and Subsequent Internal Investigation and Regulatory Scrutiny.*

Plaintiff alleges that Defendants' recklessness is demonstrated by PLDT's placement of Defendant Chua and three other executives on leave, PLDT's engagement of an accounting firm and law firm to investigate the elevated CapEx spend, and the SEC's direction to the PSE to investigate. AC ¶¶ 377-80. Like Plaintiff's other scienter allegations, these allegations are insufficient.

*First*, courts routinely hold that allegations of resignations or terminations, like Plaintiff's, are insufficient to support a strong inference of scienter absent allegations that the resignation or termination was "accompanied by suspicious circumstances." *Zucco*, 552 F.3d at 1002; *see also In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002) ("Plaintiff can point to no particularized allegation refuting the reasonable assumption that [defendant] was fired simply because the errors that led to restatement occurred on his watch or because he failed adequately to supervise his department. Any inference beyond that

40
DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

is unwarranted without more specific allegations."); *In re Downey Sec. Litig*, 2009 WL 2767670, at *13 (C.D. Cal. Aug. 21, 2009) (similar). The Complaint contains no such allegations.

*Second*, with respect to Plaintiff's allegations regarding internal investigations and regulatory scrutiny, "the mere existence of an investigation cannot support any inferences of wrongdoing or fraudulent scienter on the part of a company or its senior management." *In re Hansen Nat'l Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007); *see also Burritt v. NutraCea*, 2010 WL 668806, at *7 (D. Ariz. Feb. 25, 2010) (same).

### h.       ***PLDT's Alleged "Pattern of Recklessly Overspending" on CapEx.***

Plaintiff alleges that Defendants' recklessness is demonstrated by his allegation that "PLDT's 2019–2022 budget overrun was not the first time that PLDT incurred losses or foregone revenues due to lapses in financial management," alleging that in 2015, under Defendant Chua's watch, "billions of pesos were reportedly lost from PLDT's coffers." AC ¶¶ 381-84. This allegation, too, is inadequate.

Although "particularized allegations demonstrating a pattern of fraud" can support a strong inference of scienter, *see ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1263-64 (C.D. Cal. 2015), Plaintiff offers no such allegations here. Instead, Plaintiff merely alleges that, in 2015, PLDT suffered a net loss in 4Q, experienced a net income decline, "engaged in heavy capital expenditures to build out its network capabilities," and alleges further that PLDT's "35% decline in net income [in 2015] was caused, in part, by a PHP 2 billion rise in fixed asset impairment due to fixed assets rendered obsolete by network plans and programs." AC ¶¶ 381-83. Because Plaintiff does not plead any facts demonstrating any fraud or wrongdoing by Defendants in connection with the 2015 loss, Plaintiff's allegations regarding the past decline in net income are insufficient to establish a

pattern of fraud that creates a strong inference of scienter. *See ScripsAmerica*, 119 F. Supp. 3d at 1263-64 (rejecting "pattern of fraud" argument where past conduct alleged did not also involve allegations of fraud).

### i.  *Plaintiff's Core Operations Theory.*

Plaintiff alleges that Defendants' recklessness is demonstrated by his allegation that PLDT's "core business is the telecommunications business" and capital spending is among its "most important expenses." AC ¶¶ 385-86. But Plaintiff's "core operations" theory does not remedy the inadequate scienter allegations.

As discussed above, "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—absent some additional allegation of specific information conveyed to management and related to the fraud or other allegations supporting scienter." *Korzen v. Tetra Tech Inc.*, 2014 WL 12603209, at *4 (C.D. Cal. Jan. 17, 2014); *see supra* Section IV.B.1.b. Under the "core operations" doctrine, a plaintiff may establish scienter by alleging "a scienter theory that infers that facts critical to a business's core operations or an important transaction are known to a company's key officers." *Plumley v. Sempra Energy*, 2018 WL 1470224, at *5 (S.D. Cal. Mar. 26, 2018), *aff'd*, 847 F. App'x 426 (9th Cir. 2021).

Critically, the Ninth Circuit has stated that invoking the core operations theory is "not easy" and requires "either specific admissions by one or more corporate executives of detailed involvement in the minutia [*sic*] of a company's operations, such as data monitoring" or "witness accounts demonstrating that executives had actual involvement in creating false reports." *Intuitive Surgical*, 759 F.3d at 1062. It applies in "exceedingly rare cases" and "[o]nly in some unusual circumstances, such as where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Id.*; *see also Pittleman v. Impac Mortg. Holdings, Inc.*, 2009 WL 648983, at *3 (C.D. Cal. Mar.

42

9, 2009), *aff'd sub nom. Sharenow v. Impac Mortg. Holdings, Inc.*, 385 F. App'x 714 (9th Cir. 2010) (core operations theory permits inference of scienter "in exceedingly rare cases where an event is so prominent that it would be absurd to suggest that key officers lacked knowledge of it").

Plaintiff's reliance on the "core operations" theory fails because he has failed to adequately allege that any one or more PLDT executives had "detailed involvement in the minutia of" any relevant operations or even what any Defendants knew or believed at the time the allegedly false or misleading statements or omissions were made, by virtue of their purported involvement in those operations. *See supra* Sections IV.B.1.b. & c; *see also Webb*, 884 F.3d at 857 (rejecting core operations theory where plaintiff alleged only "generalized access to reports" allegedly containing contrary information); *Plumley v. Sempra Energy*, 2018 WL 1470224, at *5 (S.D. Cal. Mar. 26, 2018) (rejecting theory where plaintiffs "only generally allege [d]efendants had access to reports that might have given rise to knowledge of the falsity of the alleged false or misleading statements"), *aff'd*, 847 F. App'x 426 (9th Cir. 2021); *Anderson v. Peregrine Pharms., Inc.*, 2013 WL 12122423, at *10 (C.D. Cal. Aug. 23, 2013) (similar), *aff'd*, 654 F. App'x 281 (9th Cir. 2016); *Knox v. Yingli Green Energy Holding Co.*, 2017 WL 3503358, at *3 (C.D. Cal. Aug. 15, 2017) (noting "demanding" requirements to plead core operations theory and rejecting application because "no meaningful inference could be drawn about what [defendant's] executives knew" regarding alleged fraud).

### 2. Plaintiff's Allegations, Viewed Holistically, Create No Inference of Scienter

The second part of the scienter inquiry asks whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Zucco*, 552 F.3d at 1006. In conducting this holistic analysis, a court must "compare the malicious and innocent inferences cognizable from the facts pled . . . , and only allow the complaint

to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Id.* at 991.

The Complaint fails this test. Plaintiff alleges no facts showing that any Defendant knew any of the at-issue statements were false or misleading. Moreover, as discussed, Plaintiff's allegations that Defendants (as a group) were on notice of "adverse facts" are inadequate and speculative and certainly create no inference of an intent to deceive. Because the Complaint alleges no facts showing that Defendants knew any of the at-issue statements were false or misleading, inferring any malicious intent on Defendants' part requires multiple speculative leaps. In contrast, the innocent inference from Plaintiff's allegations of, at most, corporate mismanagement (which is denied) is readily apparent.

### C.    Plaintiff Fails to Plead Loss Causation

The Complaint should be dismissed because it fails to adequately plead loss causation. To prove loss causation Plaintiff must show a causal connection between the fraud and the loss by "tracing the loss back to the *very facts* about which defendant lied." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (emphasis added). "The ultimate issue" in loss causation analysis "is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd*, 811 F.3d at 1210. Here, Plaintiff's allegation that PLDT's "fraudulent scheme" to inflate stock prices was revealed by the Press Release is insufficient to allege loss causation for several reasons.

*First*, Plaintiff fails to allege how the Press Release reveals any inaccuracy in PLDT's prior statements about its 5G rollout or depreciation expenses and net income, and identifies no statements during the Class Period that allegedly "revealed the truth" about either the 5G rollout or depreciation expenses. *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 838 (9th Cir. 2022) ("The burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through corrective disclosures which caused the company's stock price to drop

44
DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

and investors to lose money."); *see also Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1198 (9th Cir. 2021) (plead loss causation "a plaintiff must allege that the share price fell significantly *after* the truth became known") (emphasis added).

*Second*, as discussed above, the Press Release did not "correct" any prior statements about PLDT's historical CapEx; it merely reported that PLDT anticipated that CapEx "will continue to be elevated as the CapEx overruns enter the financial statements *this year and next*." Ex. F at 1432 (emphasis added). *See supra* Section IV.A.1.a. Even though the price of PLDT's shares fell following the Press Release, Plaintiff has not pleaded facts demonstrating that the drop was caused by any alleged revelation of prior misstatements instead of PLDT's disclosure of new "firm-specific facts" about its future financial condition. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005) ("When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but […] new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.").

*Third*, the single statement in the Press Release—that PLDT is undertaking a reorganization process—is insufficient to show that PLDT had made false statements about its internal controls. *See, e.g.*, *Lechner v. Infusystem Holdings, Inc.*, 2017 WL 11593803 at *9 (C.D. Cal. Dec. 15, 2017) (no loss causation when company announced audit committee would be evaluating accounting error that led to forty percent drop in stock price and later announced it had "taken the necessary steps to correct and implement the appropriate internal controls to strengthen [its] financial reporting").

*Finally,* the media reaction to the Press Release that Plaintiff alleges does not establish loss causation because none of the articles cited suggest that the statements Plaintiff challenges were false or misleading when made, to the limited extent they even reference the subject matter of the allegedly false statements. *See In re Wet Seal, Inc. Sec. Litig.,* 518 F.Supp.2d 1148, 1172 (C.D. Cal. 2007) ("Newspaper

45

articles should be credited only to the extent that other factual allegations would be—if they are sufficiently particular and detailed to indicate their reliability. Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel."). Plaintiff has therefore failed to adequately plead loss causation.

### D. Plaintiff's Claims Against the Individual Defendants Are Improperly Group Pled and Deficient for the Foregoing Reasons

Plaintiff's allegations are, for the most part, directed categorically at all "Defendants" in an effort to assign collective blame, *e.g.*, AC ¶ 34, and Plaintiff appears to allege that all Defendants are liable under Section 10(b) and Rule 10b-5 for (and acted with the requisite scienter as to) each and every one of the over 100 alleged misstatements alleged in the Complaint, *id.* ¶¶ 424-28. Such collective allegations are improper because where (as here) there are multiple defendants:

> Plaintiffs must allege specific facts relating to each Defendant, indicating the role each Defendant played in perpetrating the fraud—the who, what, when, where, and how of the fraud. . . . Plaintiffs may not meet the requisite pleading standard by making generalized allegations that group the Individual Defendants together or simply assert what the company did without identifying the actors responsible.

*Cheung v. Keyuan Petrochemicals, Inc.*, 2012 WL 5834894, at *4 (C.D. Cal. Nov. 1, 2012) ("group pleading" and "generalized 'everyone did everything' allegations . . . are simply insufficient"). Plaintiff also relies only on certain Defendants' status and internal positions to suggest they (and apparently all) had control over the alleged misstatements without specifying how each Defendant controlled what statement, or the Defendant's intent to deceive, as is required. *See, e.g.*, AC ¶¶ 34, 374; *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 607 (where plaintiffs "seek to hold individuals and a company liable on a securities fraud theory," they must "allege scienter with respect to each of the individual defendants"). Plaintiff's Section 10(b) and Rule 10b-5 claims against Defendants Pangilinan, Panlilio, and Victorio-Aquino should be dismissed because Plaintiff has not pled that each has made material

misstatements or had the requisite scienter. Plaintiff has also failed to plead facts establishing loss causation.

**Pangilinan**: Plaintiff attributes a total of twenty-nine alleged misstatements to Defendant Pangilinan, AC ¶¶ 127, 131, 136, 143, 145, 149, 152, 161, 166, 174, 187, 218, 237, 256, 258, 266, 272, 276, 279, 282, 285, 288, 291, 294, 297, 300, 303, 306, 309. Plaintiff bases these attributions on the fact of his being a signatory on SEC filings, or on alleged statements during earnings calls and through press releases. *Id.* As shown above, Plaintiff alleges no facts to show that these statements were false or misleading, or that Pangilinan did not believe the statements when they were made. *See supra* Section IV.A; Appx. statements 1, 3, 7, 11, 13, 16, 18, 24, 28, 33, 42, 65-66, 79, 89-99, 101-12. Further, several of these statements fall under the PSLRA's Safe Harbor provision or are otherwise unactionable. *See supra* Section IV.A Plaintiff also alleges no facts sufficient to show Defendant Pangilinan had an intent to deceive. Plaintiff asserts that (i) Defendant Pangilinan had access to the SAP systems and its records, along with other Individual Defendants, AC ¶ 357; (ii) he and other Defendants did not inquire about the details of the CapEx reported to him, *id.* ¶ 358; (iii) he "discussed" capital expenditures, *id.* ¶ 374; and (iv) he headed the Technology Strategy Committee, *id.* ¶¶ 375-76. None of these are sufficient to show that Pangilinan had the requisite intent. *See supra* Section IV.B. Plaintiff has also failed to show how the Press Release corrected any of Pangilinan's alleged misstatements. *See supra* Section IV.C.

**Panlilio**: Plaintiff attributes a total of eleven alleged misstatements to Defendant Panlilio. AC ¶¶ 139, 147, 182, 191, 198, 205, 214, 223, 230, 245, 252. Plaintiff bases these attributions on the fact of his being a signatory on SEC filings, or on alleged statements during earnings calls and through press releases. *Id.* As shown above, Plaintiff alleges no facts to show that these statements were false or misleading, or that Panlilio did not believe the statements when they were made. *See supra* Section IV.A; Appx. statements 9, 14, 38, 45, 50, 57, 62, 69, 74, 83, 87.

47

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

Further, several of these statements fall under the PSLRA's Safe Harbor provision or are otherwise unactionable. *See supra* Section IV.A. Plaintiff also asserts that Defendant Panlilio "uncovered the budget overrun in May 2022 after vendors complained about nonpayment." AC ¶ 321. Defendant Panlilio could not have had the intent to disclose false statements about something he, according to Plaintiff, discovered almost a year and a half into the Class Period. Nonetheless, Plaintiff asks the Court to infer scienter based on (i) Defendant Panlilio saying that PLDT was enhancing its internal CapEx approval procedure, *id.* ¶ 366; (ii) his acknowledgment that CapEx spending was high, consistent with public disclosures, *id.* ¶ 370; (iii) his statement that he would like to reduce CapEx moving forward, *id.* ¶ 372; (iv) his position on the Technology Strategy Committee, *id.* ¶¶ 374-76; and (v) his acknowledgement that competition in the telecom market was aggressive, *id.* ¶ 395. As discussed above, none of these are sufficient to show Defendant Panlilio had an intent to deceive, nor do they explain Panlilio's role in the alleged fraud. *See supra* Section IV.B. Plaintiff has also failed to show how the Press Release corrected any of Panlilio's alleged misstatements. *See supra* Section IV.C.

**<u>Victorio-Aquino</u>**: Plaintiff attributes seven alleged misstatements to Defendant Victorio-Aquino, all based solely on Victorio-Aquino having signed Forms 20-F and Forms 6-K attached to press releases that Plaintiff alleges contain misstatements. AC ¶¶ 169, 200 207, 209, 216, 221, 225. Again, Plaintiff alleges no facts to show that these statements were false. *See supra* Section IV.A.1; Appx. statements 30, 52, 58, 59, 64, 68, 71. On scienter, Plaintiff alleges that Victorio-Aquino signed the December 19, 2022 Form 6-K, AC ¶ 362, and that she explained that the PLDT Board approves projects, *id.* ¶ 365. These sparse facts are insufficient to show that Victorio-Aquino had the requisite intent. *See supra* Section IV.B. Plaintiff has also failed to show how the Press Release corrected any of Victorio-Aquino's alleged misstatements. *See supra* Section IV.C.

48

### E. Plaintiff's 20(A) Claims Fail as a Matter of Law

Under Section 20(a), any person who controls a person liable for violating Section 10(b) is jointly and severally liable for the violation. 15 U.S.C. § 78t(a). In order to establish control person liability, Plaintiffs must allege (1) a primary violation of Section 10(b), and (2) the exercise of actual power or control by one of the Defendants over the person alleged to have violated Section 10(b). 15 U.S.C. § 78t(a); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014). Plaintiff's 20(a) claims should be dismissed because, as discussed above, Plaintiff has failed to allege a material misstatement, scienter, and loss causation and thus has failed to plead a primary violation. *See supra* Sections IV.A-C; *Zucco,* 552 F.3d at 990 ("Section 20(a) claims may be dismissed summarily, however, if a plaintiff fails to adequately plead a primary violation of section 10(b).").

## V. CONCLUSION

For the foregoing reasons, Defendants request that Plaintiff's Amended Complaint be dismissed with prejudice in its entirety.

Dated:  October 10, 2023

Respectfully Submitted,

**MILBANK LLP**

By: */s/ Daniel M. Perry*
Daniel M. Perry (State Bar #264146)
DPerry@milbank.com
MVillaverde@milbank.com
Mark D. Villaverde (State Bar #331876)
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4404
Facsimile: (213) 629-5063

*Attorneys for Defendants PLDT Inc., Manuel V. Pangilinan, Alfredo S. Panlilio, and Marilyn A. Victorio-Aquino*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendants PLDT Inc., Manuel V. Pangilinan, Alfredo S. Panlilio, and Marilyn A. Victorio-Aquino, certify that this brief contains 15,965 words, which complies with the word limit set by court order dated September 15, 2023 (ECF 43).


Dated: October 10, 2023                     **MILBANK LLP**

                                            By: */s/ Daniel M. Perry*
                                                Daniel M. Perry

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES