**LEVI & KORSINSKY, LLP**
David C. Jaynes (SBN 338917)
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel: (213) 985-7290
Email: djaynes@zlk.com

*Lead Counsel for Lead Plaintiff*
*Dr. Kevin Douglas and the Class*

*[Additional counsel on signature page]*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DR. KEVIN DOUGLAS, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>PLDT INC., MANUEL V. PANGILINAN, ALFRED S. PANLILIO, ANNABELLE L. CHUA, MARILYN A. VICTORIO-AQUINO, MA. LOURDES C. RAUSA-CHAN, GIL SAMSON D. GARCIA, JUNE CHERYL A. CABAL-REVILLA, AND JANE BASAS,<br><br>Defendants. | Case No. 2:23-cv-00885-FLA (MAAx)<br><br><u>CLASS ACTION</u><br><br>DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF (1) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, APPROVAL OF THE PLAN OF ALLOCATION, AND FINAL CERTIFICATION OF THE CLASS AND (2) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND LITIGATION EXPENSES AND FOR AN AWARD TO LEAD PLAINTIFF<br><br>Date: August 5, 2024<br>Time: 1:30 p.m.<br>Judge: Hon. Fernando L. Aenlle-Rocha<br>Courtroom: 6B |

# **TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ..................................................................5

II.   FACTUAL SUMMARY OF LEAD PLAINTIFF'S ALLEGATIONS .........7

III.  PROCEDURAL HISTORY ....................................................................9

    A.    Commencement of the Action and Appointment of Lead Plaintiff and Lead Counsel ...............................................................................9

    B.    The Amended Complaint ...............................................................9

    C.    The Motion to Dismiss................................................................11

    D.    Mediation .....................................................................................12

    E.    Settlement and Preliminary Approval of Settlement .........................13

IV.   THE SETTLEMENT IS IN THE BEST INTERESTS OF THE CLASS AND WARRANTS FINAL APPROVAL ................................................15

    A.    The Settlement is Fair, Reasonable, and Adequate.............................15

    B.    Risks of Continuing Litigation...................................................17

        1.    Discovery ...................................................................17

        2.    Class Certification........................................................19

        3.    Summary Judgment .....................................................19

        4.    Trial............................................................................19

    C.    Lead Counsel's Compliance With The Court's Preliminary Approval Order Requiring Issuance Of The Notice ..........................22

    D.    The Plan of Allocation is Fair and Reasonable..................................23

    E.    The Reaction of the Class ...............................................................25

V.    LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES, LITIGATION EXPENSES, AND AWARD TO LEAD PLAINTIFF IS REASONABLE AND SHOULD BE GRANTED..26

A.    The Fee Application..............................................................................26

1.    The Favorable Outcome Achieved is the Result of the
Significant Time and Labor Expended by Lead Counsel.........26

2.    The Quality of Representation and Result Obtained................28

3.    The Substantial Contingency Fee Risks Borne by Lead
Counsel .....................................................................................28

4.    The Favorable Result Obtained for the Class...........................29

5.    The Support of Lead Plaintiff and Reaction of the Class.........29

B.    Lead Counsel's Application for Reimbursement of Expenses ..........30

C.    Awards for Lead Plaintiff....................................................................33

VI.    EXHIBITS ....................................................................................................33

I, Shannon L. Hopkins, pursuant to 28 U.S.C. §1746, hereby declare as follows:

1. I am a partner at Levi & Korsinsky, LLP, ("Levi & Korsinsky" or "Lead Counsel"), which the Honorable Cormac J. Carney appointed Lead Counsel for Lead Plaintiff, Dr. Kevin Douglas ("Lead Plaintiff"), and the Class in the above-captioned securities class action matter ("Action").[1] I am an attorney admitted to practice in this Court. Unless otherwise indicated, the statements made in this declaration are based upon my personal knowledge.

2. I submit this declaration in support of (1) Lead Plaintiff's Motion for Final Approval of Class Action Settlement, Approval of the Plan of Allocation, and Final Certification of the Class and (2) Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses and Award to Lead Plaintiff.

3. I have personally participated in, overseen, and monitored the prosecution of this Action, and have otherwise been kept informed of developments in this litigation by attorneys working with me and under my supervision. As Lead Counsel, I led the prosecution of this Action against defendants PLDT Inc., ("PLDT" or "the Company") Manuel V. Pangilinan, Alfred S. Panlilio, Annabelle L. Chua, Marilyn A. Victorio-Aquino, Ma. Lourdes C. Rausa-Chan, Gil Samson D. Garcia, June Cheryl A. Cabal-Revilla, and Jane Basas ("Individual Defendants" and with PLDT, "Defendants" and together with Lead Plaintiff, the "Parties").

4. This declaration sets forth the nature of the investigation, litigation, and negotiations that led to the Settlement, demonstrating why the Settlement is fair, reasonable, and adequate and should be approved by this Court, as well as why Lead Counsel's request for an award of attorneys' fees, litigation expenses, and an award to

---

[1] Unless otherwise noted, all capitalized terms not defined herein shall have the same meaning ascribed to them in the Stipulation of Settlement dated February 16, 2024 (the "Stipulation"). ECF 54-7. References to paragraphs of the Stipulation are in the form "Stipulation, ¶_." References to paragraphs of Plaintiff's Amended Complaint for Violations of the Federal Securities Laws (the "Complaint") (ECF 33) are in the form "¶_." "Ex." refers to exhibits attached to the Hopkins Declaration.

Lead Plaintiff are reasonable and should be approved by the Court. The Memorandum of Points and Authorities in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement, Approval of the Plan of Allocation, and Final Certification of the Class (the "Final Approval Memorandum") and a Memorandum of Points and Authorities in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses, and for an Award to Lead Plaintiff (the "Fee and Expense Memorandum"), are filed contemporaneously herewith.

## I.    PRELIMINARY STATEMENT

5.      The proposed Settlement, which will resolve all claims against Defendants for $3 million in cash, is, as the Honorable Cormac J. Carney preliminary concluded, "fair, reasonable, and adequate" and in the best interests of the Class.[2] *See* Order Granting Lead Plaintiff's Unopposed Motion for Preliminary Approval of Class Action Settlement (the "Preliminary Approval Order"). ECF 56 at 22. There are no facts that have altered that preliminary decision, and the Settlement should be affirmed. The risks of prosecuting this litigation through the entirety of discovery, class certification, summary judgment, and trial would delay any recovery for years and, in fact, "even if Plaintiffs could secure a better result than the Settlement represents at trial, any result obtained after additional litigation or trial would take significantly longer and there is a risk that Plaintiffs could have received much less, or nothing at all." *Id.* at 17. Moreover, as discussed further below, it is likely that the cost of litigation through trial would exceed maximum recoverable damages.

---

[2] "Class" or "Class Member" means all persons or entities who purchased or otherwise acquired PLDT American Depository Shares ("ADS") during the period from January 1, 2019, through December 21, 2022, inclusive. Excluded from the Class are: (1) the Defendants; (2) any individual defendant's Immediate Family Members; (3) any firm, trust, corporation, or other entity in which a defendant has or had a controlling interest; (4) the Company's subsidiaries and affiliates; (5) any person who is an officer, director or controlling person of the Company; (6) the Company's directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (7) the legal representatives, affiliates, heirs, successors in interest, or assigns of any such excluded person or entity. All persons who submit valid and timely requests for exclusion from the Class will also be excluded.

6.     The Settlement was only achieved after Lead Plaintiff, by and through Lead Counsel, conducted an extensive investigation involving interviews of former employees, performed substantial legal and factual research, and consulted with economic experts, and then drafted the 204-page amended complaint. Additionally, Lead Counsel engaged in a rigorous mediation session before highly experienced mediator Jed D. Melnick, Esq. of JAMS, during which counsel for the Parties engaged in discussions with the mediator concerning the Parties' and carriers' respective positions on all issues relating to liability, damages, defenses, collectability, and Lead Plaintiff's likelihood of success at future stages of the litigation, including discovery, summary judgment, and trial. The Settlement resulted from good-faith, arm's-length negotiations between experienced counsel, under the supervision of an experienced and highly respected mediator.

7.     "The $3 million Settlement reflects a substantial outcome for class members and presents a fair compromise given the costs, risks, and delay of trial and appeal." ECF 56 at 15. Indeed, the $3 million recovery is very reasonable when considering the costs and risks in the context of the potential recovery. A successful verdict on all claims could result in aggregated damages of, at most, $19.5 million. The Settlement reflects an approximately 15.4% recovery on that $19.5 million.

8.     As discussed in the Fee and Expense Memorandum, Lead Counsel's request for attorneys' fees in the amount of $750,000, or 25% of the Settlement Fund, the benchmark in the Ninth Circuit, is justified given the facts of this case, the substantial benefits conferred on the Class, the risks undertaken, the quality of representation, and the nature and extent of legal services performed. The requested fee of $750,000 yields a negative multiplier of 0.94 compared to the lodestar figure of $799,017.75. Lead Counsel's fee and expense request is also fully supported by Lead Plaintiff.

9.     Finally, Lead Counsel seeks a $5,000 service award to Lead Plaintiff Dr.

Kevin Douglas in recognition of the time and effort he has devoted to the prosecution of this Action.

10.    I respectfully submit that, for the reasons discussed herein and, in the exhibits attached hereto, in the Final Approval Memorandum, and in the Fee and Expense Memorandum, the Settlement is fair, reasonable, and adequate in all respects, the Plan of Allocation is fair, reasonable, and has a rational basis, and the Fee and Expense Application is fair and reasonable and should be approved.

## II.    FACTUAL SUMMARY OF LEAD PLAINTIFF'S ALLEGATIONS

11.    This is a federal securities class action alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against Defendants.

12.    PLDT is a telecommunications company incorporated in the Philippines and whose ADSs are listed on the NYSE under the ticker symbol "PHI." ¶22. PLDT provides fixed line, wireless, fiber optic, and broadband services. *Id.* To remain competitive, PLDT requires frequent capital expenditures to update its infrastructure, thereby improving data speeds, area coverage, and network reliability. ¶58.

13.    Lead Plaintiff alleges that, throughout the Class Period, PLDT was under extreme pressure from the Philippine government to improve the quality of its services. In 2019, Filipino President Duterte brought a foreign competitor to the Philippines, implemented several competitive regulations and threatened to seize PLDT's assets if Defendants did not improve service by the end of 2020. ¶¶73, 77-80. Around this time, PLDT also experienced significant increases in the demand for, and usage of, its internet services as more people worked from home during the COVID-19 pandemic. ¶91.

14.    Thus, in response to increased competition, increased demand, and threats from the government, Defendants approved an aggressive PHP 330 billion capital budget to upgrade and expand PLDT's network and assets, scheduled to occur over a four-year period, from 2019 to 2022. ¶89. Lead Plaintiff alleges that Defendants spent

recklessly to expand PLDT's network, including infrastructure for 5G wireless services, without the necessary internal controls in place to ensure accountability and compliance with the Board-approved budgets. *Id*.

15.    Lead Plaintiff further alleges that, throughout the Class Period, Defendants falsely represented to investors that, among other things, PLDT was on "full blast on 5G rollout" and "[d]ata traffic on Smart's 5G network grew significantly... driven by aggressive 5G network roll-outs and 5G product offerings." ¶¶237, 250, 333. In May 2022, Defendants stated that the deployment of 5G was still "accelerated" and the "continued rollout" of 5G was supporting service revenue growth. ¶252. But PLDT had secretly stopped the 5G rollout because of a lack of demand, leaving most of the newly ordered 5G equipment sitting idle in warehouses. ¶¶333, 350.

16.    While PLDT reported capital spending of PHP 330.6 billion for the four-year period of 2019 through 2022, its actual capital spending for that period was PHP 379 billion, an undisclosed budget overrun of approximately 13%. ¶108.

17.    On December 19, 2022, before market open, Defendants issued a press release, filed with the U.S. Securities and Exchange Commission, entitled "ELEVATED CAPEX SPEND" revealing the massive capital expenditure cost overrun. ¶312. PLDT explained that "while these substantial capex investments were key to meeting PLDT's goals, they came at a price—capex investments for these four years aggregated PHP 379 billion, including an estimated budget overrun of no more than PHP 48 billion." *Id*. Defendants admitted the overrun was comprised of "undocumented" purchases orders that were not recorded in PLDT's accounting records, requiring PLDT to have to "reconstruct the books" to reconcile its inventory and vendor payments. ¶8.

18.    Upon the news, PLDT's share price fell $6.35 per ADS, or more than 23%, to close at $20.46 per ADS on December 19, 2022 on very high trading volume. ¶315. Thus, Defendants' prospects and business results were materially worse than

represented because of the massive capital expenditure cost overrun, and Defendants made materially false and misleading statements concerning, *inter alia*, PLDT's capital expenditures, 5G rollout and internal controls throughout the Class Period. ¶312.

## III.   PROCEDURAL HISTORY

### A. Commencement of the Action and Appointment of Lead Plaintiff and Lead Counsel

19.    On February 6, 2023, plaintiff Sophia Olsson filed a putative class action complaint on behalf of herself and all other persons similarly situated who purchased or otherwise acquired PLDT's securities between January 1, 2019 and December 19, 2022, inclusive, against PLDT and several individuals including the Individual Defendants in the United States District Court for the Central District of California, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 by misrepresenting, *inter alia*, material information relating to PLDT's historical capital expenditures. *See* ECF 1.

20.    On April 7, 2023, Dr. Kevin Douglas filed a motion for appointment as lead plaintiff. ECF 9. By Order dated April 26, 2023, after receiving one other motion to appoint lead plaintiff and approve lead counsel, the Honorable Cormac J. Carney appointed Dr. Douglas as Lead Plaintiff , and approved his choice of Levi & Korsinsky as Lead Counsel. *See* ECFs 10, 11, 24.

### B. The Amended Complaint

21.    On July 7, 2023, after an extensive investigation by Lead Counsel, Lead Plaintiff filed a detailed 204-page amended complaint alleging violations of the Exchange Act on behalf of all investors who purchased or otherwise acquired PLDT ADSs between April 23, 2020 and December 19, 2022, inclusive, and were damaged as a result. *See* ECF 33.

22.    The Complaint was based on Lead Counsel's investigative efforts, which included a thorough investigation of the claims and facts underlying this Action,

necessitating in-depth reviews and analysis of *inter alia*: (i) PLDT's public filings with the SEC; (ii) PLDT's public filings with the Philippine Stock Exchange, Inc. ("PSE"); (iii) Defendants' other public statements, including quarterly press releases, earnings call transcripts, and presentations; (iv) reports of securities and financial analysts, news articles, and other commentary and analysis concerning PLDT and the industry in which it operates; and (v) review of pertinent court filings. Lead Counsel also retained an investigator who interviewed PLDT former employees to obtain first-hand accounts of Defendants' alleged misconduct. Lead Counsel reviewed written memoranda of the interviews, and also consulted with financial and industry experts, and drafted, but did not file due to the Settlement, an opposition to Defendants' Motion to Dismiss the Amended Complaint.

23.    Lead Plaintiff alleged that Defendants made materially false and misleading statements concerning, *inter alia*, PLDT's capital expenditures, internal controls, and 5G rollout. The misleading nature of Defendants' statements remained hidden until December 19, 2022 when PLDT disclosed a capital budget overrun during the years 2019 to 2022. ¶312.

24.    Lead Counsel undertook efforts to cause all Individual Defendants named in the Complaint to be served in the Philippines in accordance with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents. Lead Plaintiff also undertook efforts to cause Defendants Annabelle Lim Chua, Manuel V. Pangilinan, Alfred Panlilio, and Ma. Lourdes C. Rausa-Chan to be personally served in the Philippines. Proofs of service for those Defendants were filed with the Court on July 28, 2023. ECFs 36-39. Defendants contested that such personal service was proper. Through Lead Counsel's continued negotiations, counsel for the appearing Defendants agreed to accept service on behalf of Defendants Pangilinan, Panlilio, and Victorio-Aquino. *See* ECF 40.

### C. The Motion to Dismiss

25. On September 14, 2023, the Parties filed a joint stipulation to extend the word limits for Defendants' motion to dismiss, Lead Plaintiff's opposition, and Defendants' reply, given the scope and complexity of the factual and legal issues raised by the Complaint. ECF 42. The Honorable Cormac J. Carney granted the Joint Stipulation to Extend Word Limits on September 15, 2023. ECF 43.

26. On October 10, 2023, Defendants PLDT, Pangilinan, Panlilio, and Victorio-Aquino moved to dismiss the Complaint ("Motion to Dismiss"). ECFs 46-48. Given the extra word allotment, Defendants' Motion to Dismiss was voluminous. Defendants advanced multiple arguments attacking falsity, scienter, and loss causation. *First,* Defendants argued that Lead Plaintiff failed to plead facts demonstrating that PLDT made any material misstatement or omission. Defendants argued that the statements Lead Plaintiff challenges are all either accurate reporting of PLDT's capital expenditures that have not been restated, unactionable forward-looking statements protected by the PSLRA's safe harbor risk warnings and/or unactionable statements of opinion for which Lead Plaintiff failed to allege lacked reasonable basis or were known to Defendants to be false when made. ECF 47 at 13-31.

27. *Second*, Defendants argued that Lead Plaintiff failed to plead facts showing that any defendant acted with an intent to defraud. *Id*. at 32-43. Defendants argued that Lead Plaintiff's theory of scienter failed because Lead Plaintiff merely alleged that the Individual Defendants knew or should have known that the statements were false by virtue of their access to information and as evidenced by statements made after the Class Period, which Defendants argued was not enough to allege scienter. *Id*. at 39-40. Defendants also faulted Lead Plaintiff for not alleging any personal pecuniary motive.

28. *Third*, Defendants argued that Lead Plaintiff failed to plead facts demonstrating loss causation because although PLDT's ADS price did fall after the press release, Lead Plaintiff did not plead facts demonstrating that the drop was caused

by the purported revelation of prior misstatements instead of PLDT's disclosure of new "firm-specific facts" about its future financial condition—i.e., the impact of the CapEx budget overrun on PLDT's financial results in the future. *Id*. at 44-46. Defendants asserted these and similar arguments vigorously and continued to do so in connection with the mediation and settlement negotiations, and undoubtedly would have done so in further proceedings such as summary judgment, trial, and any appeals.

29.     Because Defendants' arguments were wide-ranging and fact-intensive, Lead Counsel had to devote substantial time and resources to researching and drafting Lead Plaintiff's opposition to the Motion to Dismiss (the "Opposition to the Motion to Dismiss.").

30.     Lead Plaintiff's Opposition to Defendants Motion to Dismiss was due December 15, 2023. Lead Counsel was nearly finished drafting it when a preliminary settlement agreement was reached. On December 1, 2023, the Parties filed the Joint Stipulation and [Proposed] Order Vacating Briefing Schedule Due to Preliminary Settlement Agreement. ECF 50.

### D. Mediation

31.     Lead Plaintiff and Defendants PLDT, Pangilinan, Panlilio, and Victorio-Aquino engaged Jed D. Melnick Esq. of JAMS to preside over a private mediation to determine whether a resolution could be reached in this Action. Mr. Melnick is a well-respected mediator with substantial experience mediating securities class actions like this. The Parties exchanged mediations briefs on November 8, 2023. Then, on November 17, 2023, the Parties participated in a rigorous mediation session during which counsel for the Parties engaged in discussions with the mediator concerning the Parties' and the insurance carriers' respective positions on all issues relating to liability, damages, defenses, collectability, and Lead Plaintiff's likelihood of success at future stages of the litigation, including discovery, summary judgment, and trial. After reaching a preliminary Settlement later that day for $3 million in cash, the Parties

negotiated and signed a Term Sheet on November 30, 2023.

32.     The negotiations between the Parties that occurred during the mediation were informed by the knowledge Lead Counsel gained from their investigation and analysis of the facts and legal issues, including consultation with Lead Plaintiff's damage consultant. Based on their familiarity with the factual and legal issues and armed with a thorough understanding of the strength and weaknesses of the claims at issue, the Parties were able to negotiate a fair Settlement accounting for the costs and risks of continued litigation. The negotiations were, at all times, hard-fought and produced a result that Lead Plaintiff and Lead Counsel believe to be in the best interests of the Class. Subsequently, the Parties negotiated a Stipulation more fully documenting the Settlement, and prepared the class notice, postcard notice, summary notice, claim form, and proposed orders for preliminary approval and final approval and entering final judgment.

### E. Settlement and Preliminary Approval of Settlement

33.     On February 16, 2024, the Parties signed the Stipulation and Lead Plaintiff filed an unopposed motion for an order: (1) preliminarily approving a proposed Settlement of the Action; (2) preliminarily certifying the Class and appointing Lead Plaintiff as Class Representative and Lead Counsel as Class Counsel for purposes of implementing the proposed Settlement; (3) approving the form and manner of giving notice to the Class and the Claim Form; (4) preliminarily approving the proposed allocation of the Settlement; (5) scheduling a hearing before the Court to determine whether the proposed Settlement, Plan of Allocation, and fee and expense requests should be given final approval; and (6) appointing Strategic Claims Services ("Strategic Claims") as the Claims Administrator to administer the Notice and the claims process (together the "Preliminary Approval Motion"). ECF 54.

34.     Pursuant to the Stipulation, Defendants will pay $3 million in cash, plus interest earned thereon, for the benefit of the proposed Class that would entirely resolve

all claims against all Defendants. Stipulation, ¶¶1.35, 2.1. In return, Class Members will dismiss, with prejudice, all claims that were, or could have been, brought against Defendants in connection with this Action. *Id.* ¶¶1.29, 4.1-4.3. The Preliminary Approval Motion included the Stipulation (ECF 54-7), as well as the proposed Notice of Pendency and Proposed Settlement of Class Action (ECF 54-9), Proof of Claim Form (ECF 54-10), Summary Notice (ECF 54-11), and Postcard Notice (ECF 54-12). The Parties have also entered into a standard Supplemental Agreement wherein Defendants have the option to terminate the Settlement if the number of Class Members who opt out equals or exceeds a certain threshold. *See* Stipulation, ¶7.6. Agreements such as this are typical in class action settlements. The only agreements made by the Parties in connection with the Settlement are the Stipulation and the confidential Supplemental Agreement.

35.    Upon final approval of the Settlement by the Court and entry of a judgment that becomes a final judgment, and upon satisfaction of the other conditions to the Settlement, the Settlement Fund shall be applied to: (a) Notice and Administration Expenses; (b) Taxes and Tax Expenses described in the Stipulation at ¶2.10; (c) Lead Counsel's attorneys' fees and expenses and award to Lead Plaintiff pursuant to 15 U.S.C. §78u-4(a)(4) to the extent awarded by the Court, and (d) to distribute the Net Settlement Fund to Authorized Claimants as allowed by the Stipulation, the Plan of Allocation, or the Court. Stipulation, ¶5.4. Each Authorized Claimant will receive a *pro rata* share of the Net Settlement Fund based on their Recognized Loss, which depends on the number of ADSs acquired and the dates of their purchase and sale as compared to the alleged corrective disclosure date. Stipulation, Ex. A-1.

36.    On March 6, 2024, the Honorable Cormac J. Carney entered the Preliminary Approval Order  granting Lead Plaintiff's Preliminary Approval Motion, appointing Dr. Kevin Douglas as Class Representative, appointing Levi & Korsinsky as Class Counsel for Settlement purposes, appointing Strategic Claims as the Settlement

Administrator, preliminarily approving the Settlement, granting provisional class certification for Settlement purposes,  approving the form of the Notice, and directing the parties and the Settlement Administrator to carry out their obligations under the Order and the Settlement. ECF 56 at 24.

## IV.  THE SETTLEMENT IS IN THE BEST INTERESTS OF THE CLASS AND WARRANTS FINAL APPROVAL

37.    While Lead Plaintiff believes that the Class would have prevailed on the merits at trial, Lead Plaintiff faced a significant risk that he would not have convinced a jury that Defendants made materially false and misleading statements with the requisite state of mind and that these statements caused Lead Plaintiff's losses. Even if Lead Plaintiff prevailed at trial, post-trial proceedings or potential collectability issues could have reduced or even eliminated Lead Plaintiff's recovery.

38.    Moreover, were the case to go to trial, it may have exhausted any Settlement value even if Lead Plaintiff recovered maximum damages.

### A. The Settlement is Fair, Reasonable, and Adequate

39.    The Settlement is procedurally fair and was reached only after arm's-length negotiations between experienced counsel knowledgeable about the facts and allegations, with the assistance of a skilled mediator after vigorous litigation.  Lead Counsel has significant experience in securities and other complex class action litigation and has negotiated numerous other substantial class action settlements throughout the country. *See* Ex. 2, Levi & Korsinsky Firm Resume.

40.    Prior to Settlement, Lead Plaintiff and Lead Counsel conducted an extensive investigation and were sufficiently informed of the case's strengths and weaknesses. *See* §III.B. *supra.* Lead Counsel then engaged in robust research, negotiation, and mediation efforts to achieve the Settlement, including researching and drafting an extensive mediation statement that addressed liability, damages, collectability, and all other legal and factual considerations pertinent to the case. Lead

Counsel further engaged and consulted with experts on complex issues relating to damages, market efficiency and loss causation, and participated in a vigorous mediation with an experienced mediator.

41.     The immediate benefits of the proposed Settlement outweigh the substantial risks, delay, and expense of continued litigation. Although, based on the extensive investigation and record, Lead Plaintiff and Lead Counsel believe their claims have merit, there are also uncertainties and risks in continuing the litigation. If the Parties did not agree to settle, they would have faced an expensive discovery process, class certification, and summary judgment briefing, and the risks of trial. A jury would have to determine numerous complex financial and securities law issues and navigate battles of the experts regarding market efficiency, loss causation, damages, and other issues related to PLDT's liability.

42.     The amount of Settlement, $3 million, is also very reasonable when considering the costs and risks in the context of the potential recovery. Lead Plaintiff's damages consultant estimates maximum recoverable damages of, at best, $19.5 million. ECF 54-1 at 7. The Settlement reflects an approximately 15.4% recovery on that $19.5 million. ECF 54-2 at ¶13.

43.     Having considered the foregoing risks and evaluated Defendants' defenses, it is the informed judgment of Lead Counsel, based upon all proceedings to date and its extensive experience in litigating class actions under the federal securities laws, that the proposed Settlement before this Court is fair, reasonable, and adequate, and in the best interests of the Class. Lead Plaintiff agrees that the Settlement is fair, reasonable, and adequate and represents a significant recovery for the Class. *See* Ex. 1, Declaration of Lead Plaintiff Dr. Kevin Douglas in Support of: (a) Motion For Final Approval of Class Action Settlement, Approval of the Plan of Allocation, and Final Certification of the Class and (b) Lead Counsel's Motion for an Award of Attorney's Fees and  Litigation Expenses, and for an Award to Lead Plaintiff ("Douglas Decl."),

¶7-9, 12.

## B. Risks of Continuing Litigation

44.    Although Lead Counsel and Lead Plaintiff believe this Action is meritorious and Lead Plaintiff would ultimately prevail in establishing liability and damages, there are significant costs and risks associated with proceeding. Defendants have expressly denied and continue to deny all charges of wrongdoing or liability against them arising out of any of the conduct, statements, acts or omissions alleged, or that could have been alleged, in the Action.

45.    The $3 million Settlement provides immediate and certain benefits to the Class. If the Action were to proceed, Lead Plaintiff would face substantial risks with respect to establishing liability and damages at each future stage of the litigation. Extensive and expensive expert discovery would also be necessary. Even if Lead Plaintiff were successful at each stage of the litigation, proceeding through trial and possible appeals would likely take many years, significantly delaying any recovery for the Class. Thus, even if Lead Plaintiff eventually triumphed at trial and appeals, the actual amount recovered might be substantially less than the Settlement Amount, or nothing at all.

### 1. Discovery

46.    Though Lead Plaintiff believes the Complaint was sufficient to overcome Defendants' Motion to Dismiss, there was a substantial risk that the Court may grant Defendants' Motion, in part or full, after the Parties completed briefing, which would have likely resulted in Lead Plaintiff conducting further investigation, drafting a second amended complaint, and drafting a response to another motion to dismiss (which Defendants would undoubtedly have filed).

47.    Discovery had not begun when the Settlement was reached. Lead Plaintiff's theory of the case would require him to rely heavily on foreign discovery to prove his claims. Lead Counsel would have had to devote extensive time and resources

to prepare international discovery requests and travel to the Philippines where all relevant witnesses and documents reside. Moreover, the Philippines is not a party to the Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters (the "Hague Evidence Convention"). Therefore, the Rules of Court primarily govern the gathering and preservation of evidence in the Philippines could vary significantly between jurisdictions. The scope of such foreign discovery would be far more limited than in the United States, which could significantly hamper Lead Plaintiff's case and take years to obtain. There is no guarantee that even if documents were produced, they would prove every one of Lead Plaintiff's allegations. There is also significant risk of not being able to obtain such discovery because foreign discovery is not subject to the same protections for evidence preservation as in the United States.

48.    In this complex matter, both sides likely would have retained multiple experts to support their respective positions, each of whom would have written at least one report, and some or all of whom may have been deposed. Expert discovery can be key to ensuring success at class certification, summary judgment, and trial. If Defendants were able to retain particularly strong expert witnesses, there is a risk that Lead Plaintiff would not have survived future stages of the litigation.

49.    Further, discovery in complex class action cases often involves extensive motions to resolve disputes. Rarely is either party victorious on every discovery dispute. Even if Lead Plaintiff's discovery motions were largely granted, it could take months – even years – to resolve all discovery disputes and complete production of relevant, responsive documents. Completing document production, depositions, expert discovery, and discovery motions in this case likely would have consumed a significant amount of Defendants' remaining insurance coverage and significantly reduced or likely eliminated the recovery available to the Class. Moreover, as of December 31, 2023, PLDT had Cash and Cash Equivalents of only 16.2 million pesos, or approximately $275,000 USD.

## 2.  Class Certification

50.    This Action has yet to progress to the class certification stage of the litigation. While Lead Plaintiff believes that securities fraud actions such as this are appropriate for class action treatment, Defendants would likely have opposed class certification. Lead Plaintiff believes that the Class satisfies the requirements of Fed. R. Civ. P. 23 and that he would prevail in establishing numerosity, commonality, typicality, and predominance. Further, Lead Plaintiff believes that he has, and would continue to, adequately and fairly protect the interests of the Class, and thus would be named as Class Representative. Lead Plaintiff is also aware, however, that Defendants would very likely advance arguments challenging price impact and market efficiency. Lead Plaintiff would have to hire his own expert, or experts, an additional expense spared the Class by settling at this time. If the Court found Defendants' arguments persuasive, it could deny certification, which would prevent recovery for absent Class members.

## 3.  Summary Judgment

51.    If the Court granted Lead Plaintiff's motion for class certification, Defendants would have then presented additional arguments at summary judgment in order to defeat Lead Plaintiff's claims. Most notably, Defendants would likely challenge the evidence regarding falsity, scienter, damages, and loss causation, the outcome of which is difficult to predict. Defendants' arguments at summary judgment would have been informed by extensive fact discovery, which could potentially undermine Lead Plaintiff's allegations regarding the falsity of Defendants' statements.

## 4.  Trial

52.    If the Action made it past the class certification and summary judgment stages, before trial, the Parties likely would have raised challenges to each other's expert witnesses pursuant to *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579 (1993). The Parties also likely would have each filed a number of motions in limine, asking the

Court to exclude certain evidence at trial. The success or failure of these motions may have significantly altered Lead Plaintiff's trial strategy.

53.    At trial, there could still be no assurance that the jury would ultimately find in Lead Plaintiff's favor. *First*, Lead Plaintiff would have been required to prove that Defendants' capital expenditure and 5G rollout statements were false or misleading. Defendants advanced several credible arguments that their Class Period misstatements were mere opinions, were forward looking projections protected by the safe harbor, and that their statements were not misleading, including because the reported capital expenditure figures were accurate, particularly given the fact that the Company never restated those figures. *See* ECF 47 at 13-16, 20-23. Even if Lead Plaintiff established falsity, he would still have had to prove that Defendants' statements and/or conduct were material to a reasonable investor.

54.    Discovery had not yet begun, and there is no guarantee that Lead Plaintiff would receive the documents needed from the Philippines to prove his case. No depositions have been conducted. Even if Lead Plaintiff obtained strong documentary evidence, if Lead Counsel would have failed to elicit relevant deposition testimony regarding the falsity of Defendants' statements, it could have been fatal to Lead Plaintiff's case.

55.    *Second*, Defendants asserted that Lead Plaintiff had not plausibly alleged Defendants acted with scienter because allegations of, *inter alia*, general motive relating to routine corporate objectives without personal benefit through insider trading, and mere access to information without reference to the contents of specific reports are insufficient to allege a strong inference that Defendants knew their statements were misleading or that Defendants were deliberately reckless in making those statements. *See* ECF 47 at 34-37.

56.    There is no guarantee that a jury upon assessing the totality of the evidence and the credibility of witnesses would find the Defendants to have a culpable state of

mind. For example, in *In re Tesla, Inc. Sec. Litig.*, despite the court granting partial summary judgment in favor of plaintiffs on falsity and scienter grounds, after a three-week trial and only a couple hours of deliberations, the jury found in favor of Tesla and CEO Elon Musk.  2022 WL 1497559, at *21 (N.D. Cal. Apr. 1, 2022).

57.     *Third,* Lead Plaintiff faced the major risk of proving loss causation and damages. To establish these elements, Lead Plaintiff would have to prove that the revelation of the alleged fraud proximately caused the declines in PLDT's ADS price and that those fraud-related causes could be parsed out from any potential non-fraud related publicly released information. For example, Defendants in this case likely would have argued that Lead Plaintiff has not plead facts demonstrating that the drop in PLDT's ADS price was caused by the purported revelation the Defendants' prior misstatements were false, rather than PLDT's disclosure of new "firm-specific facts" about its future financial condition—i.e., the impact of the capital expenditure budget overrun on PLDT's financial results in the future. Moreover, Defendants were likely to argue that the statements Lead Plaintiff challenged relating to PLDT's 5G rollout and internal controls were not shown to be false or misleading by the alleged corrective disclosure about the capital expenditure overrun. ECF 47 at 44-46.

58.     In the end, even on the best facts, loss causation and damages issues often become a hotly contested trial with a battle of the experts that could be difficult for a jury to understand. If Defendants' expert won, the Court or the jury may have found that Lead Plaintiff was entitled to significantly lower damages than anticipated – or none at all.

59.     Moreover, prevailing at trial would not necessarily result in a larger recovery. The jury could award a smaller per-ADS amount of damages, overall damages could be reduced during the post-verdict claims process, and/or the verdict could be appealed. Moreover, given that maximum recoverable damages are estimated at $19.5 million, it is possible that the expense of the litigation through trial would exceed the

estimated maximum damages.

60.    Lead Plaintiff also faced the real risk that a Philippine court would not enforce a United States judgment and, even if it did, there could be Philippine currency controls and regulations which may limit or delay the transfer of funds out of the Philippines.

61.    In sum, discovery, class certification, summary judgment, trial, and beyond, would require a significant amount of additional time and expense with no guarantee that any additional benefit would be provided to the Class. The Settlement eliminates these risks. Thus, the $3 million settlement is an excellent result for the Class.

### C. Lead Counsel's Compliance With The Court's Preliminary Approval Order Requiring Issuance Of The Notice

62.    Pursuant to the Preliminary Approval Order, the Court-approved Notice was mailed to potential Class Members who could be identified with reasonable effort and a Summary Notice was published on *Globe Newswire* on April 10, 2024. *See* Ex. 4, the Declaration of Josephine Bravata Concerning: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections ("Bravata Decl."), ¶10. Strategic Claims also posted these documents on the Settlement-specific website. *Id.*, ¶12. The Notice advised the Class of the terms of the Settlement and the Plan of Allocation as well as the procedure and deadline for filing objections. In total, 43,258 potential Class Members were notified of the Settlement by Postcard Notice or email containing a direct link to the Notice and Claim Form on the Settlement website. *Id.*, ¶8. Potential Class members were identified by transfer records provided to Strategic Claims by Lead Counsel, as well as from brokerage firms and other banks, financial institutions, and other nominees holding PLDT ADSs in street name for Class members.

63.    The Notice provided, *inter alia*: (i) a description of the nature of the Action and claims asserted; (ii) the definition of the Class; (iii) the amount of the Settlement;

(iv) the reasons for and material terms of the Settlement; (v) the Plan of Allocation; (vi) the maximum amount of attorneys' fees and expenses that will be sought; (vii) the time and manner for requesting an exclusion from the Class or objecting to the Settlement, Plan of Allocation, or the requested attorneys' fees and expenses; (viii) the date, time, and place of the Settlement Hearing; (ix) the identity and contact information of the representatives of Lead Counsel and procedures for making inquiries; and (x) the binding effect of a judgment on Class Members.

64.    Strategic Claims also established a webpage on its website at www.strategicclaims.net/pldt/ and uploaded information concerning the Settlement and provided access to downloadable copies of the Claim Form, Notices, Stipulation, Preliminary Approval Order, and other key filings in this Action. Bravata Decl., ¶12. In addition, Strategic Claims established and continues to maintain a toll-free telephone number, (866) 274-4004, to respond to inquiries from Class Members regarding the Settlement. *Id.*, ¶11.

65.    The deadline for Class Members to request exclusion from the Class or to file an opposition to the Settlement, Plan of Allocation, and/or Fee and Expense Application of July 15, 2024 has not yet passed.  To date, Lead Counsel has received one objection and Strategic Claims has received two requests for exclusion, discussed further below.

### D. The Plan of Allocation is Fair and Reasonable

66.    If approved, the Plan of Allocation will govern how the proceeds of the Net Settlement Fund will be distributed among Class Members who submit timely, valid Proof of Claim forms. Lead Counsel prepared the proposed Plan of Allocation in consultation with Lead Plaintiff's financial and damages experts.

67.    The Plan of Allocation provides formulas for calculating the Recognized Loss of each Class Member, based on each such Class Member's purchases or acquisitions of PLDT ADSs during the Class Period and if or when they were sold and

at what price. The Plan of Allocation assumes that the price of PLDT's ADSs were artificially inflated throughout the Class Period. The estimated alleged artificial inflation in the price of PLDT's ADSs was computed based on the fraudulent conduct alleged by Lead Plaintiff and the price change in the ADSs, net of market and industrywide factors, in reaction to Defendants' December 19, 2022 disclosure revealing, *inter alia*, that, from 2019 to 2022, PLDT spent PHP 379 billion on capital expenditures, an overrun of PHP 48 billion (USD 866 million). In order for a Class Member to have a Recognized Loss under the Plan of Allocation, the PLDT ADS must have been purchased or acquired during the Class Period and held through the December 19, 2022 corrective disclosure date. The Plan of Allocation, as described in the Notice, provides a specific formula for computing each Class Member's Recognized Loss based on when the claimant purchased and sold PLDT's ADS. *See* ECF 54-9, Ex. A-1 at 15-19.

68.    Depending on the number of eligible ADSs purchased by investors who elect to participate in the Settlement and when those ADSs were purchased and sold, the average distribution is estimated to be $0.58 per damaged ADS purchased during the Class Period, before deduction of Court-approved fees and expenses ($0.42, net of requested fees, expenses, and awards). ECF 54-2 ¶19. The per ADS amount assumes all eligible Class Members submit valid and timely Claim Forms. If fewer than all Class Members submit valid and timely Claim Forms, which is likely, the distribution per ADS will be higher. Additionally, no distribution will be made to Authorized Claimants who would otherwise receive a distribution of less than $10.00.

69.    If any portion of the Net Settlement Fund remains following distribution pursuant to the Plan of Allocation and is of such an amount that, in the discretion of Lead Counsel, it is not cost effective to redistribute the amount to the Authorized Claimants, then such remaining funds, after payment of any further Notice and Administration Costs and Taxes, shall be donated to, subject to Court approval, the

Investor Protection Trust, with which neither Lead Plaintiff nor Lead Counsel is affiliated. The Institute for Investor Protection is an independent academic center that educates investors about the private remedies available to aggrieved investors.

70.    To date, there has been only one objection to the Plan of Allocation, discussed in §IV.E., *infra*.

71.    The structure of the Plan of Allocation is designed to achieve an equitable and rational distribution of the Net Settlement Fund among Authorized Claimants. Lead Counsel submits that the Plan of Allocation is fair and reasonable and should be approved together with the Settlement.

**E. The Reaction of the Class**

72.    While the objection and exclusion deadline, July 15, 2024, has not yet passed, there has been only one objection and two requests for exclusion. The *pro se* objector, Matthew Miner ("Miner" or the "Objector") (ECF 58), should be overruled for both procedural and substantive reasons. *First*, the Objector lacks standing because he has not provided any proof that he is a member of the Class.

73.    *Second,* while styled as an "Objection to Proposed *Settlement*," the Objector appears to only take issue with the Plan of Allocation—he does not argue that the Settlement amount is insufficient. Rather, the Objector complains that, "[u]nder the terms of the Proposed Settlement, it is estimated that the Objector would 'get' approximately $7.54, however such amount would not actually be paid as it is under $10." ECF 58, ¶5. Courts, routinely approve plans of allocations identical to this that limit the distribution to claims with recoverable losses that exceed $10.00 because it is simply not economical to process claims with smaller losses as the cost to process the claim typically exceeds the amount of the claim.

74.    Moreover, the Objector does not provide grounds for why the entire Settlement should not be approved for the rest of the Class. The Objection also takes issue with attorneys' fees, which is addressed in §V.A.5., *infra.*

75.    Lead Counsel also received two requests for exclusion. One request, submitted by Juliias Ellis, is improper. Mr. Ellis does not appear to be a Class member as he sold all his PLDT ADSs by November 2, 2022, prior to the corrective disclosure.

76.    The second request for exclusion submitted by Michael Armand Recio Penson, purports to have acquired 12.616411 ADSs during the Class Period that were held through the corrective disclosure. Bravata Decl., Ex. E. It is not clear that Mr. Penson is a Class member as he did not provide any supporting documentation for his purchases. While Mr. Penson does not provide any reason for his exclusion request, he does not appear to take issue with any aspect of the Settlement and his purchases represent a very minimal amount of PLDT ADSs in the public float.

77.    Lead Counsel is aware of no state or federal official that has raised an objection or concern regarding the settlement.

## V.    LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES, LITIGATION EXPENSES, AND AWARD TO LEAD PLAINTIFF IS REASONABLE AND SHOULD BE GRANTED

### A. The Fee Application

78.    As compensation for their efforts, Lead Counsel requests an award of attorneys' fees in the amount of $750,000, or 25% of the $3 million Settlement Fund, and reimbursement of $67,490.63 in expenses reasonably incurred in the prosecution and Settlement of the Action. *See* Fee and Expense Memorandum, filed herewith.

### 1.    The Favorable Outcome Achieved is the Result of the Significant Time and Labor Expended by Lead Counsel

79.    Lead Counsel has vigorously prosecuted this case on a fully contingent basis without any compensation whatsoever and incurring substantial expenses without any guarantee of success. This Settlement is the result of over a year of detailed investigation, hard-fought litigation, and arm's length mediation, as described above, *See* §III., *supra*.

26

80.     Subsequent to reaching a settlement in principle, Lead Counsel negotiated the final settlement terms, and drafted and finalized the Settlement documents. Lead Counsel also consulted with experts regarding the Plan of Allocation and prepared the documents required for preliminary and final approval of the Settlement. Lead Counsel will continue to expend necessary time and resources in ensuring the finalization of the claims process. As demonstrated in Lead Counsel's Firm Resume, Lead Counsel is comprised of experienced and skilled practitioners in the securities litigation field who have achieved significant recoveries on behalf of aggrieved investors. *See* Ex. 2, Levi & Korsinsky Firm Resume.

81.     Since the inception of the Action, Lead Counsel has dedicated 1,262.02 hours of professional time to the investigation, prosecution, and resolution of the claims asserted against Defendants, resulting in a lodestar of $799,017.75. The requested fee of $750,000 (25% of the Settlement Fund), yields a ***negative*** multiplier of 0.94 compared to the lodestar figure.

82.     Below is a schedule that indicates the amount of time spent by each attorney and professional staff member at Levi & Korsinsky who worked on this Action and the lodestar calculations based on their current billing rates. The hourly rates for Lead Counsel range from $900 to $1,000 for partners, $475 to $600 for other attorneys, and the hourly rate for professional staff is $325. *See* the Declaration of Shannon L. Hopkins on Behalf of Levi & Korsinsky, LLP in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses ("Fee Decl."), Ex. 3A. The lodestar of attorneys who worked less than ten (10) hours on the Action has been excluded entirely from the lodestar calculation and Lead Counsel has further reduced its lodestar to exclude duplicative time.

| | HOURS | HOURLY RATE | LODESTAR |
|---|---|---|---|
| Hopkins, Shannon (Partner) | 214.00 | $1,000 | $214,000.00 |
| Potrepka, Gregory (Partner) | 52.75 | $900 | $47,475.00 |
| Jaynes, David (Associate) | 198.75 | $600 | $119,250.00 |
| Embleton, Morgan (Associate) | 219.00 | $600 | $131,400.00 |
| Foley, Amanda (Associate) | 396.30 | $550 | $217,965.00 |
| Von Richthofen, Cole (Associate) | 11.00 | $500 | $5,500.00 |
| Meyer, Melissa (Associate) | 34.75 | $500 | $17,375.00 |
| Fuhrman, Christina (Staff Attorney) | 13.50 | $475 | $6,412.50 |
| Phillips, Samantha (Paralegal) | 64.25 | $325 | $20,881.25 |
| Rodriguez, Jessica (Paralegal) | 29.67 | $325 | $9,642.75 |
| Viera, Stephanie (Paralegal) | 11.20 | $325 | $3,640.00 |
| Westphalen, Arden (Paralegal) | 16.85 | $325 | $5,476.25 |
| **Total** | **1,262.02** | | **$799,017.75** |

83.     Moreover, Counsel's time does not include additional time spent preparing for the final approval hearing, as well as time spent after final approval relating to administration of the Settlement.

## 2. The Quality of Representation and Result Obtained

84.     The attorneys at Levi & Korsinsky are experienced and skilled securities class action litigators and have successful track records in securities cases throughout the country. *See* Ex. 2, Levi & Korsinsky Firm Resume.

85.     Defendants are represented by Milbank LLP, a preeminent law firm that has defended numerous securities cases resulting in favorable decisions for defendants. This large and highly capable defense firm spared no effort in the vigorous defense of their respective clients. In the face of this knowledgeable and formidable opposition, Lead Counsel was nevertheless able to develop a case that was sufficiently strong to persuade the Defendants to settle it on terms that are favorable to the Class.

## 3. The Substantial Contingency Fee Risks Borne by Lead Counsel

86.     Lawsuits like this one are expensive to litigate. Those unfamiliar with the

efforts required to litigate class actions often focus on the aggregate fees awarded at the end but ignore the fact that those fees fund enormous overhead expenses incurred during the course of many years of litigation, are used to fund the expenses of other contingent cases prosecuted by class counsel, and help pay the salaries of the firms' attorneys and staff.

87.   Lead Counsel undertook and prosecuted this Action on an entirely contingent basis with no guarantee of any compensation. Lead Counsel has also incurred significant expenses in litigating this Action for the benefit of the Class. Any fees or expenses awarded to Lead Counsel have always been at risk and are completely contingent on the result achieved. To date, Lead Counsel has received no compensation for their efforts or payment of litigation expenses.

### 4.   The Favorable Result Obtained for the Class

88.   In the Preliminary Approval Order, the Honorable Cormac J. Carney preliminarily found that "Lead Counsel achieved a significant result for the class and has ably litigated this case." ECF 56 at 20. The Honorable Cormac J. Carney further found that "the Settlement's relief is adequate." *Id.* at 15.  If Plaintiffs had continued to litigate the case, any available funds or insurance proceeds would have been depleted, resulting in a lower recovery, or possibly no recovery at all.

89.   After consulting with an economic expert, Lead Plaintiff and Lead Counsel believe a successful verdict on all claims would result in aggregated damages of, at most, $19.5 million. The $3 million recovery under the proposed Settlement constitutes approximately 15.4% of the maximum theoretical aggregate damages of $19.5 million, assuming Plaintiff prevailed on all claims against Defendants.

### 5.   The Support of Lead Plaintiff and Reaction of the Class

90.   Lead Plaintiff approved Lead Counsel's Fee and Expense Application. Lead Plaintiff actively monitored the litigation and consulted with Lead Counsel over the course of this Action, as well as throughout the Settlement negotiations. Lead

Counsel acted under the supervision of, and negotiated within the settlement authority granted by, the Lead Plaintiff.

91. As discussed above, Lead Counsel has received only one Objection to date. ECF 58. The Objection should be overruled for both procedural and substantive reasons, as detailed previously in §IV.E., *supra.*

92. Even though Lead Counsel had yet to file its motion in support of counsel's fee and expense request, the Objection takes issue with Lead Counsel's request for attorneys' fees, stating that "Lead Counsel has not shown sufficient time or expense spent to justify the payment of $750,000." ECF 58 at ¶8. Moreover, the Objection provides no substantive basis for this meritless and conclusory statement and is entirely silent about the hours Lead Counsel spent litigating the Action, the work that had been done to reach the Settlement, the recovery achieved, or the continued risks of litigation. Such unreasoned and baseless objections like this one are improper.

93. Had the Objector waited until Counsel submitted the fee and expense motion, he would have seen that the $750,000 fee request will result in a ***negative*** lodestar multiplier.[3]

**B. Lead Counsel's Application for Reimbursement of Expenses**

94. Lead Counsel seeks reimbursement from the Settlement Fund of $67,490.63 for expenses reasonably and actually incurred in connection with their prosecution of this Action. This is well below the noticed $100,000 expense cap communicated in the Notice. Lead Counsel's expenses were reasonable and necessary to the prosecution and resolution of this Action.

95. Lead Counsel took significant steps to avoid unnecessary expenditures and minimize expenses wherever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

---

[3] The Objection to attorneys' fees is also addressed in the Fee and Expense Memorandum, filed concurrently.

30

96.     The expense schedule below identifies the specific categories of expenses,
*e.g.*, filing fees, fees for experts and consultants, investigative fees, online legal and
factual research, travel costs, meals, incurred by Lead Counsel.

| CATEGORY | EXPENSES |
|---|---|
| Mediation Fees | $16,000.00 |
| Investigative Fees | $15,000.00 |
| Process Server Fees | $14,916.63 |
| Computer Research Fees | $9,346.87 |
| Travel Costs | $5,342.56 |
| Expert Fees | $3,589.75 |
| Meal Costs | $1,868.78 |
| Filing Fees | $1,035.42 |
| Photocopy Costs | $390.62 |
| **TOTAL EXPENSES** | **$67,490.63** |

97.     To the extent some of the above categories may require additional
information to clarify their meaning and scope, Lead Counsel provides the following
additional explanations:

a.  <u>Mediation Fees</u>: The $16,000.00 mediation fee for which Lead
    Counsel request reimbursement was paid to JAMS for the services
    of Jed D. Melnick Esq., who conducted a mediation session with the
    parties leading to the Settlement of the litigation.

b.  <u>Investigative Fees</u>: Lead Counsel incurred $15,000.00 in expenses
    paid to Blackpeak Inc. ("Blackpeak"). Lead Counsel retained
    Blackpeak to provide private investigation services and conduct
    numerous fact interviews with former PLDT employees located
    abroad, and other relevant third parties in the preparation of the
    amended complaint in the Action.

c.  <u>Process Server Fees</u>: Lead Counsel incurred fees of $14,916.63 for
    process servers. There were eight individual defendants in addition
    to the Company, PLDT. All were located in the Philippines. Lead

Counsel undertook efforts to cause all Individual Defendants named in the Complaint to be served in the Philippines through the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents. Lead Plaintiff also undertook efforts to cause Defendants Annabelle Lim Chua, Manuel V. Pangilinan, Alfred Panlilio, and Ma. Lourdes C. Rausa-Chan to be personally served in the Philippines.

d. <u>Computer Research Fees</u>: This category includes $9,346.87 in fees paid to vendors such as LexisNexis, Thomson Reuters-Westlaw, CapitalIQ, and Pacer.

e. <u>Travel and Meals Costs</u>:  Lead Counsel incurred $5,342.56 in travel costs and $1,868.78 in meal costs. In connection with the prosecution of this Action, Levi & Korsinsky has paid for travel expenses to, among other things, attend court hearings and mediations. This also includes $3,000 in estimated costs for air fare, hotels, and meals for attending the final approval hearing.

f. <u>Expert Fees</u>: Lead Counsel incurred $3,589.75 in expenses paid to Forensic Economics, Inc., and Crowninshield Financial Research. These entities are experts in the fields of financial economics, market efficiency, loss causation, and damages. They provided Lead Counsel with advice and counsel as to numerous complex issues concerning the markets for PLDT ADSs and damages, and further assisted Lead Counsel during the mediation and settlement negotiations with the Defendants. Forensic Economics further assisted Lead Counsel in preparing the Plan of Allocation.

98.    The expenses requested are reflected in the records of Lead Counsel, prepared in the normal course of business and are an accurate record of the expenses

incurred. *See* Fee Decl., Ex. 3D-3H.

### C. Awards for Lead Plaintiff

99.    Lead Plaintiff Dr. Kevin Douglas respectfully requests an award of $5,000. In the Preliminary Approval Order, the Honorable Cormac J. Carney found "the proposed incentive award of $5,000 for Lead Plaintiff appears reasonable and appropriate for Lead Plaintiff's work reviewing pleadings, Defendants' motion to dismiss briefing, and material prepared in connection with the mediation, reviewing news and information about PLDT, conferring with Lead Counsel on legal strategy, case status, settlement negotiations, and other issues, and evaluating and approving Defendants' mediation settlement offer." ECF 56 at 22.

100.    Further, Lead Plaintiff monitored Lead Counsel and regularly communicated with Lead Counsel regarding the litigation, risks, and strategy. *See* Douglas Decl., ¶5. In doing so, Lead Plaintiff spent approximately 40 total hours overseeing this litigation. Lead Plaintiff's hourly billing rate as a physician was $150.00 per hour. *Id.*, ¶6. Given these facts, a $5,000 award is warranted and should be approved.

### VI.    EXHIBITS

101.    Attached hereto as Exhibit 1 is a true and correct copy of the Declaration of Lead Plaintiff Dr. Kevin Douglas in Support of: (a) Motion For Final Approval of Class Action Settlement, Approval of the Plan of Allocation, and Final Certification of the Class and (b) Lead Counsel's Motion for an Award of Attorney's Fees and Litigation Expenses, and for an Award to Lead Plaintiff.

102.    Attached hereto as Exhibit 2 is a current, true, and correct copy of the Firm Resume of Levi & Korsinsky, LLP.

103.    Attached hereto as Exhibit 3 is the Declaration of Shannon L. Hopkins on Behalf of Levi & Korsinsky, LLP in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Litigation Expenses (hereinafter "Fee Declaration").

104.    Attached as Exhibit 3A to the Fee Declaration is a true and correct

summary of the amount of time spent by attorneys and professional support staff at Levi & Korsinsky, LLP who were involved in the prosecution of the Action, and the lodestar calculation based on my firm's current hourly billing rates. The firm's rates did not change while the Action was ongoing.

105.   Attached as Exhibit 3B to the Fee Declaration is a true and correct task report, summarizing the amount of time spent by attorneys and professional support staff at Levi & Korsinsky, LLP who were involved in the prosecution of the Action, organized by task.

106.   Attached as Exhibit 3C to the Fee Declaration is a true and correct detailed billing report summarizing the amount of time spent by attorneys and professional support staff members at Levi & Korsinsky, LLP who were involved in the prosecution of the Action, organized by attorney.

107.   Attached as Exhibit 3D to the Fee Declaration is a true and correct total summary of the expenses incurred by Lead Counsel in litigating this Action for which Lead Counsel seeks reimbursement.

108.   Attached as Exhibit 3E to the Fee Declaration is a true and correct breakdown of the filing fees incurred by Lead Counsel in litigating this Action for which Lead Counsel seeks reimbursement.

109.   Attached as Exhibit 3F to the Fee Declaration is a true and correct breakdown of the Expert, Process Server, Investigative, and Mediation Fees incurred by Lead Counsel in litigating this Action for which Lead Counsel seeks reimbursement.

110.   Attached as Exhibit 3G to the Fee Declaration is a true and correct breakdown of the travel and meal expenses incurred by Lead Counsel in litigating this Action, including estimates to attend the Settlement Hearing, for which Lead Counsel seeks reimbursement.

111.   Attached as Exhibit 3H to the Fee Declaration is a true and correct breakdown of the research and photocopy fees incurred by Lead Counsel in litigating

this Action for which Lead Counsel seeks reimbursement.

112.    Attached as Exhibit 4 is the Declaration of Josephine Bravata Concerning: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections.

113.    Attached as Exhibit 5 is a true and correct copy of *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review* by Edward Flores and Svetlana Starykh.

114.    Attached as Exhibit 6 is a true and correct copy of *Securities Class Action Settlements, 2023 Review and Analysis*, Cornerstone Research (2024) by L.T. Bulan and L.E. Simmons.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.


Executed this 10th day of June, 2024 at Stamford, Connecticut.


*/s/ Shannon L. Hopkins*
Shannon L. Hopkins